**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                     Case No.: 1:23-CV-00549 MSN-IDD

RICHARD M. RUND,

      Defendant.

<u>**MR. RUND'S OPPOSITION TO PLAINTIFF'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

II. Response to Plaintiff's Statement of Undisputed Material Facts  . . . . . . .    5

III.    Facts as Viewed in the Light Most Favorable to Mr. Rund  . . . . . . . . .   22

   A. (1950 to 1968) Mr. Rund Encountered Early Life Challenges and
      Underperformed in School  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

   B. Mr. Rund has had ADHD since Birth and Currently Suffers from Mild
      Cognitive Impairment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

   C. (1968 to 1980) Mr. Rund Became an Entrepreneur  . . . . . . . . . . . . . . .   24

   D. (1980 to 1982) Mr. Rund moves to Hong Kong and Discovers he has a
      Passion and a Talent for Inventing  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

   E. Mr. Rund's Trusted Professional Advisors  . . . . . . . . . . . . . . . . . . . . . .   25

   F. Mr. Rund's Business, Real Estate and Investment Activities  . . . . . . . .   26

      1.   Mr. Rund's Business Operations  . . . . . . . . . . . . . . . . . . . . . . . . . .   26

         a.   *FOB Products, Ltd.* (1982 to 2000)  . . . . . . . . . . . . . . . . . . . . .   26

         b.   *FOB Instruments, Ltd.*  (2000 to 2007)  . . . . . . . . . . . . . . . . . . .   27

         c.   Loss of FOB Instruments (2007 to Present)  . . . . . . . . . . . . . . .   29

      2.   Mr. Rund's Real Estate Holdings (1988 to 2013)  . . . . . . . . . . . . .   31

      3.   Sark Consultants, Classic Research and Far East Ventures (1990 to
         Present)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

   G. Bank Accounts Relevant to this Action  . . . . . . . . . . . . . . . . . . . . . . . .   34

      1.   The BEA Accounts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

      2.   The UBS Account  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

      3.   The China Construction Bank  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

IV.    Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

**Page**

A.  Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    38

B.  The Evidence, When Viewed in the Light Most Favorable to Mr.
    Rund, Raises a Genuine Issue of Material Fact about Whether
    between 2003 and 2008 he Honestly Believed, Based on Advice of his
    CPA, that he was only Required to Report on FBARs Accounts in his
    Name and Over Which he had Signature Authority and Whether that
    Belief was Objectively Reasonable  . . . . . . . . . . . . . . . . . . . . . . . . . .    39

    1.  Mr. Rund's FBAR for 2003 Tends to Show that he Discussed His
        Foreign Accounts with Daniel Reznick, the CPA who Prepared his
        form 1040, and Was Advised that he Was Required to Report
        Accounts in His Name and Over Which he had Signature
        Authority  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

    2.  The BEA Accounts and UBS Account Were Not In Mr. Rund's
        Name and He Did Not have Signature Authority Over Them  . . . .    40

    3.  Even Though Foreign Account Box on 2005 Schedule B Checked
        No, Mr. Rund Still filed a Timely FBAR for His HSBC Account  .    40

C.  Overview of Facts Viewed in a Light Most Favorable to Mr. Rund  . .    41

    1.  Mr. Rund was Unsophisticated if Not Illiterate in Business and Tax
        Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

    2.  Mr. Rund Conferred with a Group of Professional Advisors Who
        Were Honest and Qualified  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

    3.  UBS Paperwork Was Never Signed or Seen by Mr. Rund and is
        also Ambiguous, Unclear, and Unreliable  . . . . . . . . . . . . . . . . . . .    43

    4.  Based on Mr. Rund's Understanding About His FBAR Filing
        Obligations, Control Was Not a Factor  . . . . . . . . . . . . . . . . . . . . .    43

    5.  Government will not be Offering Expert Testimony on Tax
        Avoidance, but Even if it did, Nothing Improper in Avoiding Taxes    44

    6.  FEV Was Accurately Disclosed in Voluntary Disclosure Prepared
        by Mr. Rund's Lawyer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44

D.  *Horowitz* Distinguished  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45

                                                                    **Page**

    E.  BEA Denied Mr. Rund Access after the Fraud was Discovered  . . . . .        47

    F.  China Construction Bank  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        47

        1.  Post Voluntary-Disclosure FBAR Filings (2009 to 2012)  . . . . . . .        47

        2.  2013 FBAR  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        48

        3.  2014 FBAR  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        49

V. Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        49

**EXHIBITS**

| Exhibit | Description |
|---|---|
| 1 | Affidavit of Richard Rund |
| 2 | TopCard Statement (redacted) |
| 3 | TopCard Services AG profile |
| 4 | 2004 USD to HKD exchange rate |
| 5 | 2008-2010 York Luen Audited Financial Statement |
| 6 | February 21, 2019 Letter from Stephen Kauffman to RA Melissa Malone |
| 7 | Excerpt of IRS Form 9984 Agent Activity Report for February 2019 (redacted) |
| 8 | 2008 FBARs (redacted) |
| 9 | 2020 FinCEN Form 114 (FBAR) (redacted) |
| 10 | E-mails regarding hedge Fund (redacted) |
| 11 | Affidavit of Jeffrey Wilken with attachment A (CV) |
| 12 | July 26, 2023 Neuropsychological Evaluation Report of Dr. Jeffrey Wilken (redacted) |
| 13 | Excerpts of Deposition of Jeffrey Wilken dated November 8, 2023 |
| 14 | Defendant's Expert Designation |
| 15 | 2003 IRS Form 1040 (redacted) |
| 16 | 2003 IRS Form TD F 90-22.1 (FBAR) (redacted) |
| 17 | 2005 IRS Form 1040 (redacted) |
| 18 | Defendant's Answers to First Set of Interrogatories |
| 19 | Defendant's Answers to Second Set of Interrogatories (redacted) |
| 20 | U.S. Patent Information |
| 21 | Complaint Excerpt |

Defendant, Richard Rund ("Mr. Rund"), by and through his attorneys James D. Skeen, Stephen P. Kauffman, Terry L. Goddard Jr., and Skeen & Kauffman, LLP, files his Opposition to Plaintiff's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56, Local Civil Rule 56, and this Court's November 16, 2023 Trial Order.  Mr. Rund asserts that there are genuine disputes of material fact as to whether his failure to file timely and accurate FBARs was willful.  Therefore, Plaintiff's Motion for Summary Judgment should be denied.  In support, Mr. Rund asserts as follows:

## I.     Introduction

This action involves Willful FBAR Penalties assessed against Mr. Rund for failure to file FBARs for bank accounts (the "Relevant Accounts") and periods (the "Relevant Periods") (collectively "FBAR Reporting Failures"). The Relevant Accounts and Relevant Periods are set forth in a chart (the "Willful FBAR Penalty Chart") incorporated into the Government's complaint at Paragraph 28. Contrary to the Government's assertion that Mr. Rund's FBAR Reporting Failures were willful, Mr. Rund contends that all his FBAR Reporting Failures were non-willful, and either excusable due to Reasonable Cause, or alternatively subject to a penalty limited to $10,000 per calendar year (the "Non-Willful FBAR Penalty").

## II.    Response to Plaintiff's Statement of Undisputed Material Facts

Pursuant to Local Rule 56(B), Mr. Rund responds to each of Plaintiff's asserted undisputed facts.  Mr. Rund notes at the outset that several of Plaintiff's purported facts are actually legal conclusions and/or inferences drawn in the light most favorable to the Plaintiff. This is contrary to the nature of an undisputed fact in the summary judgment context.  *See Smith v. Collins*, 964 F.3d 266 (4th Cir. 2020) (noting that "all reasonable inferences drawn from the evidence" is to be viewed "in the light most favorable to the non-moving party"); *see generally,*

*James McHugh Construction Co. v. Travelers Property Casualty Co. of America*, 223 F.Supp.3d 462, 471 (D.Md. 2016) (articulating that the moving party bears the "initial burden of showing that the ***undisputed facts***, when viewed through the prism of applicable legal principles, entitle it to judgment as a matter of law." (emphasis added)).

1.  Admitted.

2.  Admitted.

3.  Mr. Rund admits that an unidentified UBS client advisor ("CA") indicated on an unsigned UBS Client Profile and Acceptance Checklist that the referenced client generated "approximately USD 1 mlo. profit/year."  Mr. Rund renews his objection to the referenced portion of the record, as detailed in his Objections to Plaintiff's Exhibits, Exhibit 2.

4.  Admitted.

5.  Admitted.

6.  Mr. Rund admits that Far East Ventures Ltd. ("FEV") opened a UBS account ending -0486.  Mr. Rund also renews his objection to the referenced portion of the record, as detailed in his Objections to Plaintiff's Exhibits, Exhibit 2.

7.  Mr. Rund admits that the transcript accurately reflects his deposition testimony, however his initial recollection was inaccurate.  In fact, a few lines later Mr. Rund corrects part of his faulty recollection when he indicates that FEV was created to carry on the work of Classic Research, which was to receive marketing fees from FOB Instruments.  Deposition of Richard Rund, October 27, 2023, pg. 29, ln. 19 – pg. 30, ln. 14, Government's Motion for Summary Judgment Exhibit 4 (future references to Governments exhibits attached to its Motion for Summary Judgment shall be referred to as "Gov't Ex. #").  In addition, FEV served as a director for FOB Instruments and York Luen.

8.  See response to number 7 above.

9.  Mr. Rund denies that this accurately reflects his deposition testimony or the statements in the referenced document, which is an IRS Form 886A.  In particular, the language in quotes does not appear in either referenced document.  Mr. Rund testified that the purpose of moving FOB Instrument money from Hong Kong to UBS was to "reduce the tax liability of FOB in Hong Kong."  Gov't Ex. 4 at pg. 57 ln. 19 – pg. 59 ln. 4.  There is no support in the referenced record portions that Mauritius is "a tax-free locality," that Mr. Rund knew it was a tax-free locality, or that the purpose was to receive money tax free from Hong Kong.  This asserted undisputed material fact calls for an expert opinion and is an example of a legal conclusion couched as an undisputed fact and attempts to articulate an inference in the light most favorable to the Plaintiff.

10.  Admitted, however, this payment continued only for a short period of time at which point Mr. Charlety advised Mr. Rund that the money was desperately needed for cash flow for FOB, which was the sole source of income for SES.  *See* Gov't Ex. 4 Tr: 48:2 to 49:5.

11.  Mr. Rund denies that he cannot explain why the UBS account was not in his name.  Mr. Rund advised Plaintiff in his deposition that the UBS account is not in his name on the advice of Y.M. Cheung, FOB Instrument's chartered auditor, and Howard Bilton of Sovereign.  Gov't Ex 4 Gov't Ex. 4 Tr: 57:19 to 59:14.  In other words, the reason it is not in his name is because these two trusted individuals recommended that he set things up this way.  Exhibit 1, Affidavit of Richard M. Rund (hereinafter referred to as "Rund Aff.") ¶¶ 28 & 29.

12.  Mr. Rund admits that Sovereign Managers, Ltd. was paid a fee for incorporating FEV for rendering director services.  Mr. Rund denies that he "does not explain why a company like FEV with no activity needs a director."  Plaintiff asked Mr. Rund why FEV needed a director and Mr. Rund responded that he "[does not] know the answer."  Gov't Ex. 4 Tr: 60:18 to 61:2.  First, Mr.

Rund objected to the form of the Plaintiff's question that elicited Mr. Rund's response.  *Id.* at pg. 61 ln. 1.  Second, Plaintiff's question calls for a legal conclusion about Mauritius law and the need for a director of a Mauritius corporation.

13. Mr. Rund admits that the referenced document is an undated portion of a UBS Client Profile and Acceptance Checklist that purports to summarize an October 24, 2002 phone conference between and among Bernhard Weber of UBS, Mr. Rund, and Howard Bilton of Sovereign.  The document states that "[t]he new set-up was entirely proposed by Sovereign Trust Ltd. and Client, "Mr. R.R.," agreed on that."  Mr. Rund did not sign any of these documents, did not see any of these documents, was never provided copies of these documents, and does not recall the summarized telephone conference taking place or any such "agreement." He would have been relying on Mr. Bilton for guidance and advice.  Rund Aff. ¶70.  Mr. Rund also renews his objection to the referenced portion of the record, as detailed in his Objections to Plaintiff's Exhibits, Exhibit 2.

14. Mr. Rund admits that in the referenced documents there are general references to "Client" and "Mr. R.R." and that during his deposition Mr. Rund supposes the R.R. reference is to him. *See, e.g.*, Gov't Ex. 4 Tr: 23:8-13. However, in other portions of the doucments Far East Ventures, Ltd. is referred to as the "Customer."  *See, e.g.*, US_PROD_000671. In addition, it appears account records for other, unrelated, accounts are mixed in with information alleged to belong to FEV.  *See, e.g.*, Gov't Ex. 2 at US_PROD_0006732.  Mr. Rund also renews his objection to the referenced portion of the record, as detailed in his Objections to Plaintiff's Exhibits, Exhibit 2.

15. Mr. Rund admits that the biographical information contained in the portion of the UBS Client Profile and Acceptance Checklist section titled "Basic Data (For Individual Account

Holder(s) or Beneficial Owner(s) or KYC of Corporate Entity) accurately his date of birth and nationality. Importantly, the document incorrectly indicates that Mr. Rund has an MBA. As noted below, Mr. Rund dropped out of school at the age of 18 and started driving a taxi in New York City. accurately lists his Training/Education. *See* Gov't Ex. 4 Tr: 53:21 to 54:9. Mr. Rund also renews his objection to the referenced portion of the record, as detailed in his Objections to Plaintiff's Exhibits, Exhibit 2.

16. Mr. Rund admits that an April 11, 2003 Verification of beneficial owner's identity by FEV identifies Mr. Rund as the "beneficial owner/s of the assets concerned," but does not define the "assets concerned." Gov't Ex. 2 at US_PROD_0006757.

17. Mr. Rund admits that the Plaintiff has accurately summarized Mr. Rund's deposition testimony.

18. Mr. Rund admits that he made only one request for funds from the FEV UBS account. Gov't Ex. 4 Tr: 40:11 – 13.

19. Mr. Rund admits that the referenced documents detail the process by which FEV requested that $675,000 be transferred to Mr. Rund's personal account at HSBC in Hong Kong for the sole purpose of attempting to save the business operations of FOB Instruments in China after discovering the embezzlement of Pierre Charlety. Gov't Ex. 4 Tr: 50:10 to 53:4. Any statement or inference contrary to this admission is denied.

20. Mr. Rund admits that the referenced documents, which appear to be e-mails between and among UBS employees on December 4, 2008, contain the referenced quoted language, which represents the interpretation of UBS employees.

21. Mr. Rund admits that an April 1, 2005 UBS AG account statement ending 846.60V in the name of Far East Ventures, Ltd. paid $225.00 on January 24, 2005 to cover an annual fee charged

to a TopCard Visa Privilege Service Card issued to Mr. Rund.  *See, e.g.*, Exhibit 2 at

US_PROD_0006730.  TopCard is a Swiss credit card company owned by UBS.  *See* Exhibit 3.

22. Mr. Rund admits that in a July 7, 2016 letter from his attorney at the time, Mark W.

Schweighofer, Esq., to IRS Revenue Agent Dyam Sanchez, he stated that "there may have been a

credit card for accounts with FEV" and that Mr. Rund's "recollection is that the credit cards were

used predominantly for business purposes, though he believes it may be possible that a small

amount of personal expenses may have been paid using those cards from time to time." *See*

Gov't Ex. 10 at Rund 005113.

23. Mr. Rund admits that when UBS informed him that they were going to close the FEV

account, he directed that the money from the closed account be deposited into his account at

HSBC.  Gov't Ex. 4 Tr: 41:2 to 42:3.

24. Mr. Rund admits that in a June 15, 2011 e-mail from his attorney, Tarah Kane, to him,

Ms. Kane advises Mr. Rund of her legal conclusion that he should "amend the FBAR to include

the UBS account, which you held as a joint owner with Far East Ventures."  Gov't Ex. 11 at

Rund 003955.

25. Mr. Rund admits that the referenced UBS documents in a section titled "Potential as

Lead/Prospect Generator" describe him as "secretive, no introductions to be expected," and

identify  "Client Needs" as "Confidentiality, Service Quality, Performance," and answers "why

did the client open an account with UBS PB" with "discretion."  Gov't Ex. 2 at

US_PROD_0006725 & US_PROD_0006726.  At least with reference to the "Client Needs"

portion, the entries are undated and unattributed hand written statements.  Other versions of these

same documents lack some of the referenced information.  *See* US_PROD_0006720. All of these

entries contain opinions of unidentified UBS employees.

26. Mr. Rund admits that the Plaintiff has accurately quoted portions of the referenced e-mail. However, Mr. Rund denies that he "cannot propose who the 'client' being referred to is, if not him." What Mr. Rund testified that he cannot "understand who they're referring to as the client when they're saying, please do not mention the client's name" and that he has "no idea" who they are referring to. Gov't Ex. 4 Tr: 44:2-16 and 49: 13-17. Mr. Rund was never asked if the e-mail was not referring to him as client then who it was referring to other than him. Finally, at Rund Tr: 48:10 to 17, Mr. Rund testifies that he suspects Mr. Charlety requested this change.

27. Admitted.

28. Admitted.

29. Admitted.

30. Admitted.

31. Admitted.

32. Admitted.

33. Mr. Rund admits all facts contained in this paragraph with the exception of the assertion that Pierre Charlety was "a boating instructor who was Rund's friend." Mr. Rund admits that he became acquainted with Mr. Charlety in 1995 when he purchased a boat in Discovery Bay, Hong Kong. *See* Gov't Ex. 14 at Rund 005310. At that time, Mr. Charlety was a boat captain who graciously taught Mr. Rund how to operate a boat. *Id*. As a result of this interaction, Mr. Rund and Mr. Charlety became close friends. *Id*.

34. Admitted.

35. Mr. Rund denies that Gov't Ex. 2 at US_PROD_0006722 supports this asserted undisputed fact. However, Govt Ex. 2 at US_PROD_0006720, which is an undated and unattributed "Source of Wealth" summary does include the phrase "Client runs FOB," which

appears to represent the interpretation of the unnamed UBS employee.  Mr. Rund asserts that the "Client" is FEV, which is a director of FOB Instruments.  Rund Aff. ¶71.

36. Mr. Rund admits that he advised the Hong Kong Police Department in a December 29, 2008 police report that from 2000 – 2008 he "regularly instructed Charlety, he reported to me about [FOB] every day."  *See* Gov't Ex. 14 at Rund 005285.  Further, Mr. Rund admits that in a February 3, 2009 Hong Kong Police Report he advised the Hong Kong Police Department that he "received cash flow statements from [Charlety's co-conspirator,] Eric Chan on a regular basis," "received audited statement prepared (always) by Y.M. Cheung," and that on February 3, 2009, Mr. Rund was aware of seven BEA accounts for York Luen and FOB.  *See* Gov't Ex. 14 at Rund 5288-5290.  Finally, Mr. Rund admits that on December 2, 2018 he advised Hong Kong Police that after the "transfer of shares and directorship of FOB to [Charlety], . . . [n]o major decisions or expenditures would be made without [Mr. Rund's] consent."  Gov't Ex. 14 at Rund 005315.  All other assertions are denied.

37. Mr. Rund admits that this statement accurately reflects his testimony.   However, York Luen owned the Four Winds property in 2003 or 2004 so, technically, York Luen sold the Four Winds property, not Mr. Rund.  Rund Aff. ¶¶ 51 & 52.

38. Admitted, while the other 2/3rds was appropriated by Mr. Charlety for FOB operations and Mr. Rund never regained access to the remaining 2/3rds.  Gov't Ex. 4 Tr: 80:14-17.

39. Mr. Rund admits that he instructed Mr. Charlety to transfer 1/3 of the Four Winds sale proceeds from a York Luen bank account to the FEV account at UBS.

40. Mr. Rund admits that Mr. Charlety complied with Mr. Rund's two requests in August and October 2004 to transfer a total of $1,300,000 HKD, representing 1/3rd of the Four Winds sale proceeds, from York Luen to FEV's UBS account.  The average exchange rate between the U.S.

Dollar and Honk Kong Dollar during that three-month period of 2004 was 7.796, so the referenced transfers totaled $167,103 USD.  Exhibit 4.

41. Admitted.

42. Admitted.

43. Admitted.

44. Admitted.

45. Mr. Rund admits that the Plaintiff has accurately quoted from portions of a November 20, 2008 unsigned draft letter to BEA authored by Andrew Lam & Co., Solicitors.

46. Mr. Rund admits that after the discovery of Mr. Charlety's fraud, he filed multiple unsuccessful civil suits in Hong Kong, which will be referred to as the **Hong Kong Litigation**, and, in April 2009, was able to regain 95% of the shares of FOB by producing for the "Hong Kong authorities the 'bought and sold' note and the instrument of transfer needed to effect the transfer of shares from Mr. Charlety."  Gov't Ex. 1 at US_PROD_0006822.

47. Mr. Rund admits that in a Hong Kong Police Report dated January 6, 2015, Mr. Rund, under possible "liabil[ity] to prosecution for a criminal offence" indicated to the Hong Kong Police that "[i]n 1999, [he] set up another new company named F.O.B. Instrument Limited (FOB) and invited [Mr. Charlety] to be a trustee of FOB," that "[a] Declaration of Trust . . . was signed by [Mr. Charlety] on [October 8, 1999] since the tax arrangement of America," and that "[according the declaration of trust, [Mr. Charlety] owned 95% shares of FOB on behalf of [Mr. Rund]."  Gov't Ex. 14 at Rund 004859.

48. Mr. Rund denies the inference raised by the Plaintiff that the Declaration of Trust "was put in place . . . 'since the tax arrangement of America.'"  The summary in the Hong Kong Police Report simply states the "Declaration of Trust . . . was signed by [Mr. Charlety] on [October 8,

1999] since the tax arrangement of America."  Gov't Ex. 13 at Rund 004859.  Mr. Rund admits

that in a December 2, 2018 Hong Kong Police Report he advised Hong Kong Police that he was

advised by Y.M. Cheung that the FOB Declaration of Trust "arrangement was to make sure that

[Mr. Rund] would not be a legal person for F.O.B. on the face, because [he] would not be in

Hong Kong on a day to day basis and most importantly, this could enable [Mr. Rund] a more

favourable tax rate in US."  Gov't Ex. 14 at Rund 005315.

49. Denied.  On June 4, 2009 Mr. Rund was appointed a director of York Luen Limited and

joined the existing director, Far East Ventures, Limited.  *See* Exhibit 5 at Rund 004147.

50. Admitted.

51. Admitted.

52. Mr. Rund admits that on or about, April 19, 2010, he was accepted into the IRS voluntary

disclosure program.  Gov't Ex. 1 at US_PROD_0006820.  Further, Mr. Rund admits that he

received a letter from UBS dated April 16, 2009 (the "Closing Letter") indicating that UBS

would be closing the FEV accounts.  Finally, Mr. Rund admits that in the Closing Letter UBS

discusses certain efforts by the Department of Justice ("DOJ") and Internal Revenue Service

("IRS") to gain information from UBS on U.S. citizens with UBS accounts held in Switzerland.

Gov't Ex. 17.  All other inferences or statements are denied.

53. Denied.  In his April 8, 2010 letter to the IRS, Mr. Rund states, with respect to FEV, that

"[s]ince its inception in 2003, Sovereign Trust Hong Kong, Ltd. has always administered FEV **in

trust for [Mr. Rund]"** and that "[Mr. Rund] has never had legal ownership, interest, control,

authority or other relationship to FEV."  Gov't Ex. 1 at US_PROD_0006823 (**emphasis

supplied**).  Plaintiff's use of phrases like "shell entity" and "directed major actions that FEV

14

took with respect to the UBS account" are undefined terms that represent legal conclusions and inferences that the Plaintiff is inappropriately drawing in its undisputed material fact section.

54. Denied.  In his April 8, 2010 letter to the IRS, Mr. Rund states that "[s]ince under Hong Kong law he did not have any legal relationship to FOB Instrument, FEV, York Luen, or any of their accounts and assets, he genuinely believed that he did not have an obligation to report these entities or accounts to the United States."  Gov't Ex. 1 at US_PROD_0006830.

55. What the April 8, 2010 letter actually states is that Mr. Rund "believes that he filed FBARs for the HSBC HK Personal Account, and attributes his failure to file FBAR's [*sic*] for any other account previously to a lack of ownership interest in the entities controlling these accounts, as well as a general lack of understanding as to his reporting obligations."  Gov't Ex. 1 at US_PROD_0006830.

56. Mr. Rund admits that he does not recall whether he mentioned FEV's UBS account to any of his tax preparers between the date it was opened and 2009.  Gov't Ex. 4 Tr: 68:18 to 69:1.

57. Admitted.

58. Admitted, until amended FBAR returns were filed for those periods.  Gov't Ex. 3.

59. Admitted.

60. Mr. Rund admits that he testified that he still felt that his reporting obligation with regard to the BEA accounts was a "gray area" stating that "if [he] had control over it and had signatory authority and [he] could direct it and [he] could instruct the bank, yes, it should be on there," but he did not have that kind level of authority over the BEA accounts.  Gov't Ex. 4 Tr: 188:14-19.

61. Mr. Rund denies that the cited reference supports the proposition that Mr. Rund "never provided copies of a legal opinion on this gray area and does not recall seeking advice from his return preparers from 2003 through 2008 on whether to disclose the BEA accounts of York Luen

or FOB.  Mr. Rund admits that the cited reference does support the assertion that Mr. Rund does

not remember whether he told Daniel Resnick about the BEA accounts or not.  Gov't Ex. 4 Tr:

173:13-18.

62. Mr. Rund admits that he has never claimed, as to the BEA accounts, that his failure to

timely report those accounts on his 2003 – 2008 FBARs was based on advice he received from

any individual after Mr. Rund told that individual about any beneficial ownership Mr. Rund may

have had in the BEA accounts.

63. Admitted.

64. Admitted.

65. Denied.  On February 21, 2019, undersigned counsel for Mr. Rund e-mailed a letter to

Revenue Agent Melissa Malone ("RA Malone") in which undersigned counsel advised RA

Malone that this office had "compiled dollar amounts to be reported on [Mr. Rund's] FBARs for

2004, and 2006 to 2008" even though "none of the actual statements for these periods are in our

possession, custody, or control."  *See* Exhibit 6.  Further, undersigned counsel advised RA

Malone that the referenced dollar amounts were based on "FBARS that were prepared by a

CPA," that undersigned counsel had "no reason to question the accuracy of what is reported on

[those] FBARs," and that "until recently [Mr. Rund] believed . . . had been filed."  *Id*.  The letter

further asserted that RA Malone already had the referenced FBARs in her possession and asked

RA Malone for any "objection, or another suggested approach" that she might have to the

calculation of the account balances.  *Id*.  On that same date RA Malone indicated that she

"[concur[ed] with your approach/decision to use the information at hand to get the FBARs filed."

Exhibit 7.  In sum, Mr. Rund's explanation, as reflected in undersigned counsel's February 21,

2019 letter and the "late filing reason" on each return is that Mr. Rund "until recently [Mr. Rund] believed they had been filed."  *See* Gov't Ex. 3.

66. Admitted, although he did so under protest to his tax professionals.  Rund Aff. ¶ 72.

67. Admitted, although Mr. Rund has no knowledge of the accounts ending 1467 & 1697.  *Id*. at ¶ 73.

68. Admitted.  Mr. Rund had no signature authority or control over these accounts prior to 2009 and never had signature authority over accounts ending 9342 & 0244.  *Id*.

69. Mr. Rund cannot explain why the referenced BEA accounts are not on the FBARs because he gave his statement information to his legal advisors and did not prepare the referenced FBARs.  *See* Gov't Ex. 4 Tr: 107:7-14 and 111:2  to 112:5.

70. Denied.  Please see Material Fact 69 response above.

71. Mr. Rund agrees that the IRS FBAR transcript for 2007 reflects a filing date of February 19, 2019, that Mr. Rund's 2007 FBAR was due on or before June 30, 2008, and the HSBC account ending 7833 is reflected on FBAR transcripts for 2002 – 2006.

72. Mr. Rund agrees that the HSBC account ending 4833 was opened on November 17, 2008.

73. Mr. Rund admits that on December 16, 2008 he had $469,674.03 USD available in HSBC account ending 4833.

74. Mr. Rund agrees that the IRS FBAR transcript for 2008 reflects a filing date of February 27, 2019, that Mr. Rund's 2008 FBAR was due on or before June 30, 2009, and the HSBC account ending 4833 is not listed on the FBAR transcript.  Mr. Rund cannot comment on the accuracy of the IRS FBAR transcript.  All versions of the 2008 FBAR available to Mr. Rund have the HSBC account ending 4833 listed on them.  *See* Ex. 8.

75. Mr. Rund agrees that the IRS FBAR transcript for 2009 includes the HSBC account ending 4833.  Mr. Rund agrees that the IRS FBAR transcript for 2008 does not list the HSBC account ending 4833.  Mr. Rund cannot comment on the accuracy of the IRS FBAR transcript. All versions of the 2008 FBAR available to Mr. Rund have the HSBC account ending 4833 listed on them.  *See* Ex. 8.

76. Admitted.

77. Admitted.

78. Mr. Rund agrees that the IRS FBAR transcript for 2013 lists two accounts at China Construction Bank ("CCB") with maximum balances listed at $37,000 and $3,277,466 and that this is consistent with the CCB account statements for 2013.

79. Admitted.

80. Admitted.

81. Mr. Rund admits that his understanding of his reporting obligations on this issue, that he did not have to report the CCB accounts on his 2013 and 2014 FBARs because he intended to reinvest the money in real estate, was incorrect.  Gov't Ex. 4 Tr: 119:6  to 122:7.  However, this misunderstanding was not willful.  Rund Aff. ¶ 84.

82. Admitted.

83. Mr. Rund admits that his belief that he did not have to report the China Construction Bank accounts on his 2013 FBAR because he planned to reinvest in another piece of real property to defer capital gains conflated his reporting obligation for FBAR purposes and his reporting obligation for income tax purposes, which, while he described it as "farblunget thinking," was probably the wrong Yiddish word to use as he was more confused/misinformed or misunderstood his reporting obligation as to the CCB account.  Rund Aff. ¶ 56.

84. Mr. Rund admits that he does not remember if he mentioned the CCB accounts to his tax preparer, Alan Kirzner, at that time, however he "was pretty – I've been pretty upfront with everybody about everything. I told him that the money went from [CCB] to a law office to a client trust fund, the law office of the attorney that was going to handle all of this Gov't Ex. 4 Tr: 122:9-21.

85. Admitted.

86. Mr. Rund admits that the 2014 FBAR transcript lists the late filing reason as "unable to access BSA E-Filing System."

87. Mr. Rund admits that the records available to him reflect a filing attempt for the 2014 FBAR on June 30, 2016, that was rejected.

88. Mr. Rund admits that a corporation of which he was a stockholder had a business account at UBS at the time the FEV UBS account was opened.  All other inferences and allegations in this paragraph are denied.

89. Mr. Rund admits that a UBS account in the name of another corporation does not appear on the FBAR filings for 2001 or 2002.  Mr. Rund asserts that there is no evidence to suggest that any UBS account prior to October of 2002 should have been reported on an FBAR.  Gov't Ex. 4 Tr: 15:17 to 16:21.

90. Mr. Rund admits that he has had an interest in a foreign hedge fund well before 2015, but certainly between 2015 and 2020 managed by Bay Resource Partners Offshore Fund Ltd. ("Bay Resource") and Tri-Pro Administrators Ltd. ("Tri-Pro") and that in 2020 he liquidated that hedge fund and transferred the funds to EFG Bank & Trust Bahamas Ltd. ("EFG").  Mr. Rund advised his tax preparer at the time, Diana Herskovitz ("Ms. Herskovtiz"), of the EFG account during preparation of his 2020 IRS Form 1040. *See* Exhibit 9 at Rund 5673.

19

91. Mr. Rund admits that Ms. Herskovitz's testified that she "repeatedly asked him about his holdings in non-US bank accounts."  Mr. Rund denies the accuracy of Ms. Herskovtiz's recollection.  Rund Aff. ¶ 74. Further, Mr. Rund believed and still believes that he was not required to report the foreign hedge fund administered by Bay Resource and Tri-Pro.  *See* Exhibit 10.

92. Mr. Rund admits that Ms. Herskovitz's testified that he did not mention "accounts" in Mauritius or Grand Cayman to her.  Ms. Herskovitz knew about the Bay Resources account.  Ms. Herskovitz did not file any FBARs for Mr. Rund between 2014 and 2021 and seems to confuse an FBAR with an IRS Form 8938.  *See, e.g.*, Gov't Ex. 32 Tr: 22:14 to 23:12.

93. Mr. Rund admits that Ms. Herskovitz's testified that he told her that he could not get account statements for the EFG account because there were no statements.  Mr. Rund denies the accuracy of Ms. Herskovtiz's recollection.  Rund Aff. ¶ 74.

94. Mr. Rund admits that he did not obtain the account balance from EFG, but noted that the amount before depositing the liquidation funds from Bay Resource was minimal.  Gov't Ex. 4 Tr: 184:2-19.

95. Denied.  Mr. Rund testified that there was not much of an account balance until the funds from Bay Resource were deposited in 2020.  *Id.*

96. See Mr. Rund's response to material fact 95 above.

97. Mr. Rund admits that Ms. Herskovitz described him as evasive twice in her deposition testimony. He believes that her testimony is self-serving.  In addition, Ms. Herskovtiz's description may be influenced by the fact that she did not know that Mr. Rund suffers from ADHD.  *See* Exhibit 11 ¶¶ 5-8.

98. Mr. Rund admits that Mr. Kirzner testified that he was difficult to deal with because he "seemed to not understand or not want to understand or was evasive. That's all I can remember." Gov't Ex. 33 Tr: 45:10-14. Mr. Kirzner's description may be influenced by the fact that he did not know that Mr. Rund suffers from ADHD. *See* Exhibit 11 ¶¶ 5-8.

99. Mr. Rund admits that Mr. Kirzner testified that he would be surprised that a client was unable to get an HSBC account balance and that Mr. Kirzner "would have mentioned" to Mr. Rund that listing an account balance as "unknown for two years in a row" would be "problematic." Gov't Ex. 33 Tr:13:3-11 and 14:9-23. Mr. Rund has no recollection of the referenced discussion with Mr. Kirzner. Rund Aff. ¶ 76.

100.     Mr. Rund admits that Plaintiff's summary of Ms. Herskovtiz's testimony is accurate, but Mr. Rund notes when he would contact Ms. Herskovitz he would provide her the information she requested. Gov't Ex. 32 Tr:59:2-6.

101.     Mr. Rund admits that Mr. Kirzner testified that he "felt that [he] had to "chase [Mr. Rund] for information." Gov't Ex. 33 Tr: 38:19-25. First, Mr. Rund has no recollection of Mr. Kirzner voicing any of these concerns to him. Furthermore, Mr. Rund notes that he and his attorneys had to chase Mr. Kirzner for information. Rund Aff. ¶ 77.

102.     Admitted.

103.     Mr. Rund admits that the IRS completed multiple forms 13448 Penalty Assessment Certifications (Title 31 "FBAR") in which it asserts a penalty under 31 U.S.C. §5321(a)(5) for multiple accounts over multiple years. Mr. Rund denies that the assessment of those penalties is appropriate.

104.     Admitted.

### III.   Facts as Viewed in the Light Most Favorable to Mr. Rund

### A.  (1950 to 1968) Mr. Rund Encountered Early Life Challenges and Underperformed in School

1. Mr. Rund's was born in 1950 in Brooklyn, NY. Gov't Ex. 4 Tr: 54:2-5.

2. Mr. Rund and his two (2) siblings were raised by a single mother and the family struggled financially. Exhibit 1, Affidavit of Richard M. Rund (hereinafter referred to as "Rund Aff.") ¶2.

3. Although the Rund family was Jewish, they lived in a predominantly Irish Catholic working-class neighborhood. Rund Aff. ¶2.

4. Because they were the only Jewish family in the neighborhood, Mr. Rund and his siblings frequently were bullied and the targets of antisemitic insults. Rund Aff. ¶3.

5. When Mr. Rund started school, he had such a hard time staying focused and following directions, that his grades were always at or near the bottom of his class. Rund Aff. ¶4.

6. Mr. Rund's academic performance was particularly bad in traditional subjects like math, science, and history, but he was creative and had an interest in artistic expression. *Id*.

7. So he applied to and was accepted by the New York School for the Performing Arts. Rund Aff. ¶5.

8. But even at the School for the Arts, Mr. Rund continued to struggle. He barely completed the school's academic curriculum and failed to complete the senior performance requirement. *Id*.

9. After the School for the Arts, he attended one semester at Bronx Community College before dropping out at the age of 18. Rund Aff. ¶6.

10.    Because he could not focus or follow directions, and because he performed so poorly in school, Mr. Rund was thought to be hearing impaired while he was in junior high school. Rund Aff. ¶7.

**B. Mr. Rund has had ADHD since Birth and Currently Suffers from Mild Cognitive Impairment**

11.       In fact, since birth Mr. Rund has had attention deficit hyperactivity disorder, inattentive type ("ADHD"), but was not formally diagnosed until 2006 when he was 56 years old. *See* Exhibit 13, Deposition of Dr. Jeffrey A. Wilken, November 8, 2023 (hereinafter referred to as Exhibit 13) at pg. 39 ln. 5 – pg. 40 ln. 23 & Rund Aff. ¶8.

12.       On April 13, 2023, while working on a ladder, Mr. Rund fell 15 feet, hit his head on the pavement, lost consciousness for 30 minutes, fractured five (5) ribs, and sustained a concussion and subdural hematoma. Exhibit 13 Tr: 9:21 to 10:6 & Exhibit 12 at Rund 005156.

13.       Dr. Mark Eisenbaum, Mr. Rund's primary care physician, referred him to Jeffrey A. Wilken, Ph.D. ("Dr. Wilken"), clinical neuropsychologist to "assess for cognitive impairment secondary to his head injury (as well as signs of mild cognitive impairment or early cortical dementia). Exhibit 12 at Rund 005156.

14.       Dr. Wilken examined Mr. Rund on July 26, 2023, and diagnosed him with mild cognitive impairment compounded with ADHD. Exhibit 13 Tr: 20:23-25 & Exhibit 12 at Rund 005164.

15.       Mr. Rund retained Dr. Wilken in this case as an expert witness in clinical neuropsychology to express opinions about (a) symptoms commonly associated with ADHD, (b) how a person with ADHD would be expected to react to the stresses that Mr. Rund encountered during the period relevant to this action, and (c) the fact that Mr. Rund presently is cognitively impaired. Exhibit 14.

16.       ADHD is a developmental disorder that is present from childhood. It doesn't tend to improve over time and interferes with functioning. Exhibit 13 Tr :8:14 to 9:9 & 20:10 to 22:21.

17.     Most people diagnosed with ADHD experience symptoms that impair function. Exhibit 13 at Tr: 65:4-22 & 66:16-25.

18.     Symptoms of ADHD typically include inattention, distractibility, disorganization, careless mistakes with work or other tasks, trouble holding attention on tasks, not listening when spoken to, not following through on instructions, failing to complete work, trouble organizing tasks and activities, avoiding tasks that require mental effort over a long period of time, being easily distracted and forgetful, tangentiality. Exhibit 13 at Tr: 11:20-25; 15:1 to 16:9, & 16:23 to 17:24.

19.     But ironically, people with ADHD can also become hyper focused on a particular project or activity to the exclusion of everything else. Exhibit 13 Tr: 69:3-25.

20.     As people with ADHD get older, their symptoms tend to become more difficult to manage. Exhibit 13 at Tr: 24:20 to 25:14.

21.     Many people find it maddening dealing with people with ADHD, because they don't listen or follow through. Exhibit 13 at Tr: 18:11 to 19:5.

22.     ADHD symptoms can be exacerbated by illness, stress, depression, loneliness, and insomnia ("Compounding Conditions"). Exhibit 13 at Tr: 60:17-25, 62:4-23, & 63:9-12.

### C. (1968 to 1980) Mr. Rund Became an Entrepreneur

23.     At the age of 18, Mr. Rund believed that he was unemployable, so he started driving a cab in New York City to support himself. Rund Aff. ¶9.

24.     He worked hard, and after driving a cab for four (4) years, he had saved enough money to purchase a New York City taxi medallion. *Id.*

25.     Several years later, he sold the taxi medallion and moved to Kingston, NY, where he used the proceeds of sale to open a retail business. Rund Aff. ¶10.

26.      Mr. Rund realized that he did not like the retail business, so in 1976 he closed his store. Rund Aff. ¶11.

27.      One of Mr. Rund's former suppliers, a Chicago-based importer of general merchandise from Hong Kong who operated chain drug stores and giftware catalogs, saw potential in Mr. Rund, and offered him a chance to work in Hong Kong. Rund Aff. ¶12.

**D. (1980 to 1982) Mr. Rund moves to Hong Kong and Discovers he has a Passion and a Talent for Inventing**

28.      In 1980, Mr. Rund moved to Hong Kong and began to learn the trading company business and how to locate and negotiate with factories in Hong Kong and Taiwan. Rund Aff. ¶13.

29.      Essentially, a trading company offers products manufactured locally (i.e. in Hong Kong or Taiwan) to overseas buyers.  Rund Aff. ¶14.

30.      After spending a short period of time in this position, Mr. Rund returned to the United States, started an import consulting business, and began running advertisements in the Wall Street Journal's classified section to attract customers. Rund Aff. ¶15.

**31.**      As Mr. Rund's customer base grew, he returned to Hong Kong in 1982 where he and a girlfriend established Core Resource Ltd. to trade in housewares and act as a buying agent for US importers. Rund Aff. ¶16.

32.      Core Resource operated until 1987, when Mr. Rund and his partner separated. Rund Aff. ¶17.

**E. Mr. Rund's Trusted Professional Advisors**

33.      Although he was creative and had an acumen for conceptualizing innovative products, Mr. Rund lacked practical experience in business structure and financial matters. Rund Aff. ¶18.

34.     As Mr. Rund established his business and lived in Hong Kong, he began to develop a circle of friends and acquaintances with professional credentials to whom he would turn for advice. Rund Aff. ¶19.

35.     This circle of advisors included Y.M. Cheung, Chinese certified public accountant, Bernhard Weber, a banker with UBS, Howard Bilton, Chairman and Founder of the Sovereign Group, other company staff accountants, and Pierre Charlety, Mr. Rund's closest and most trusted friend. *Id.*

### F. Mr. Rund's Business, Real Estate and Investment Activities

### 1. Mr. Rund's Business Operations

### *a. FOB Products, Ltd.* (1982 to 2000)

36.     Based on his experience with Core Resource, Mr. Rund discovered that he preferred making new products as opposed to operating a trading company. Among his first products was a digital timer that he developed in the mid-1980s. Rund Aff. ¶¶20 & 21.

37.     In or about 1988, after separating from his partner, Mr. Rund formed FOB Products Ltd. ("FOB Products"), a Hong Kong corporation through which his timers and other products were developed, manufactured, marketed, and sold. Rund Aff. ¶22.

38.     In 1992, Mr. Rund applied for and was granted U.S. utility patent #5,089,998 Vibrating & Audible Alarm Clock named "Shake Awake," a product he created to assist people who are deaf or hearing impaired. Rund Aff. ¶23 & Exhibit 20.

39.     At about this same time, he also created his first digital cooking thermometer. Rund Aff. ¶24.

40.     Mr. Rund's life in Hong Kong was very chaotic. It was essentially a 'work-eat-drink' cycle that took a toll on his emotional and physical health.  As a result of the high stress,

Mr. Rund developed an alcohol dependency.  As his physical and mental health deteriorated, he realized that he needed to return to the United States to access rehabilitation for his alcoholism, and afterwards to interact more closely with customers, to gain better marketplace insight and develop new products to expand FOB's business. Rund Aff. ¶¶25 & 26.

### b. *FOB Instruments, Ltd.*  (2000 to 2007)

41.     In 1999, Mr. Rund made the decision to depart Hong Kong and return to the United States.  Rund Aff. ¶27. He hired Pierre Charlety, a French expat and his closest and most trusted friend, to run FOB Instruments in Hong Kong. *Id*.

42.     He transferred FOB Products' physical assets, financial assets, and customer base to FOB Instruments Ltd ("FOB Instruments"), a new Hong Kong corporation formed to succeed FOB Products. Rund Aff. ¶28.

43.     He transferred control of FOB Instruments to Mr. Charlety, who executed a Declaration of Trust on behalf of Mr. Rund. Rund Aff. ¶29.

44.     FOB Instruments' financial accounts were opened at the Bank of East Asia {"BEA"). *Id*.

45.     Mr. Charlety and Eric Chan, an in-house accountant hired by Mr. Charlety, had signature authority over the BEA accounts. Rund Aff. ¶30.

46.     **Mr. Rund did not have signature authority over any of these BEA accounts at this time**. *Id***.**

47.     In early 2000, Mr. Rund returned to the United States and entered a residential rehabilitation program in Virginia. Rund Aff. ¶31.

48.     During the period 2000 to 2008, Mr. Rund worked from his home in the United States. *Id***.**

49.      Throughout the existence of FOB Products, (FOB Instrument's predecessor) its production had been subcontracted to manufacturing jobbers. Subcontracting production resulted in numerous problems, including production delays, quality control issues and inadequate engineering support for new product development. Rund Aff. ¶32.

50.      At the urging of Mr. Charlety and in an effort to address these issues, Messrs. Rund and Charlety decided to have FOB Instruments build a factory in Shenzhen, China to manufacture FOB Instrument's products, which was named Smartime Electronics Shenzhen ("SES").  See Gov't Ex. 1 at US_PROD_0006824.  Under the guise of protecting FOB Instruments, Messrs. Charlety and Chan established  a Hong Kong limited company named Smartime Network Technology ("SNT") to own SES. Rund Aff. ¶33. Mr. Charlety advised Mr. Rund that he had executed a Declaration of Trust for the shares of SNT on Mr. Rund's behalf, which was safely filed at his apartment in Hong Kong. SES grew to employ 150 workers. Rund Aff. ¶34. As Mr. Rund discovered later, this was not true. Rund Aff. ¶42.

51.      At all times, FOB Instruments served as the sole source of orders and income for SES.  Rund Aff. ¶35. Messrs. Charlety and Chan managed the business operations, both in Hong Kong and China. *Id*. Mr. Rund communicated daily with Mr. Charlety, and with Mr. Chan as well, but less frequently. *Id***.**

52.      Between 2003 and 2007, FOB Instrument's business expanded because of Mr. Rund's efforts. In 2003, FOB Instruments obtained major manufacturing responsibility from a US client. This necessitated moving the factory to a 55,000 square foot building in the village of Bao'an, Shenzhen. Rund Aff. ¶36.

53.      In 2006 or 2007, FOB Instruments secured production of the entire digital timer & thermometer program for Walmart.  *Id*. Employment at SES grew to 300+ production staff. *Id*.

28

54.      Mr. Rund travelled often to Hong Kong/China to confer with customer service and production staff.  Rund Aff. ¶37. He also worked closely with FOB's engineering staff to develop new products and technologies for digital timers and thermometers, for which he filed and was granted six (6) additional U.S. utility patents. *Id*. Mr. Rund assigned these patents to FOB Instruments. *Id*.

### c. Loss of FOB Instruments (2007 to Present)

55.      In 2007, Mr. Rund began receiving anonymous emails telling him that Messrs. Charlety and Chan were cheating him. Rund Aff. ¶38. Mr. Rund asked Y.M. Cheung, FOB Instrument's outside CPA in Hong Kong, to help him investigate these allegations. Rund Aff. ¶39. Mr. Rund learned that Messrs. Charlety and Chan were siphoning off FOB Instruments' profits to SNT.  *Id*. Y.M. Cheung's firm issued a report to Mr. Rund highlighting irregularities in Messrs.' Charlety's and Chan's accounting practices. *Id***.**

56.      Mr. Rund confronted Mr. Charlety by telephone and email correspondence about these allegations.  Rund Aff. ¶40. Mr. Charlety denied any wrongdoing and assured Mr. Rund that everything was in order.  *Id*. In mid-2008, on very short notice, Mr. Charlety advised Mr. Rund that he was returning to France for treatment of cancer, after which he would return to Hong Kong.  Rund Aff. ¶41. However, he advised that Mr. Rund must immediately come to China to run SES in his absence.  *Id*.

57.      Mr. Rund arrived in Hong Kong to meet with Mr. Charlety who had already departed.  Rund Aff. ¶42. Mr. Rund visited Mr. Charlety's apartment to retrieve the Declaration of Trust for SES.  *Id*. The landlord, with whom Mr. Rund was familiar, told him that Mr. Charlety had been gone for three (3) years. *Id*. It was then that Mr. Rund realized that Messrs. Charlety and Chan had been deceiving him and everything was falling apart. *Id*.

58.     The factory building SES occupied in Shenzhen was owned by the local village. Rund Aff. ¶43. At this time, Mr. Chan stopped paying SES's workers. *Id*. Local village officials promised Mr. Rund that they would permit him to remove factory contents if he would pay workers, for which the village would otherwise be responsible. Rund Aff. ¶44. After spending $500,000+ to keep the factory solvent the village reneged, sealed the factory premises and seized SES's machinery, inventory and molds for auction.  *Id*. Mr. Rund hired a local attorney, but Chan appeared to be orchestrating the proceedings behind the scenes.  Rund Aff. ¶45. In the end Mr. Rund's application to the China court failed, and the village auctioned all of SES's seized assets. *Id*.

59.     In 2009, Mr. Rund formed Fastway Technology Ltd. ("Fastway"), a Hong Kong limited company owned by Shake Awake Products LLC in an attempt to continue FOB Instruments' business, again by subcontracting production.  Rund Aff. ¶46. In 2010, he formed Fame Finance Ltd. ("Fame Finance"), also a Hong Kong limited company to hold rights to the seven (7) patents, in the expectation that royalties could be paid at some point in the future. Rund Aff. ¶47. Neither company was able to get off the ground. *Id*. Mr. Rund filed several police reports and for the next 7-8 years continued pursuing legal action in an effort to recover his losses. Rund Aff. ¶48. These legal actions are collectively referred to as the "Hong Kong Litigation").

60.     The Hong Kong Litigation consisted of dozens of lawsuits prosecuted over more than a decade between 2007 and 2020. *Id*.

61.     Mr. Rund became hyperfocused on the Hong Kong Litigation to the exclusion of almost everything else. Rund Aff. ¶49. During the pendency of the Hong Kong Litigation, Mr.

Rund traveled to China and Hong Kong about 25 times. *Id*. Ultimately, the Hong Kong Litigation failed. *Id*.

62.        In connection with the Hong Kong Litigation, and later in connection with his efforts to correct his Reporting Failures, Mr. Rund attempted to obtain bank statements for FOB Instruments as well as York Luen (discussed below) from BEA, where Messrs. Charlety and Chan maintained the company accounts. Rund Aff. ¶50. Because he did not have signature authority over the accounts, BEA refused to give him access. *Id*.

### 2. Mr. Rund's Real Estate Holdings (1988 to 2013)

63.        In 1988, Mr. Rund desired to purchase an apartment in Hong Kong that was owned by York Luen, Ltd. ("York Luen"), a Hong Kong limited company. Rund Aff. ¶51. Mr. Rund bought the common stock of York Luen Ltd. and resided in the apartment for the next fourteen (14) years. *Id*.

64.        Subsequently, York Luen purchased two (2) additional Hong Kong properties: an office suite on the second floor which FOB occupied, and a small street-level retail shop to generate rental income. Rund Aff. ¶52. Both of these properties were in the same building. *Id*.

65.        Mr. Rund transferred the York Luen stock to FOB Instruments at about the same time he returned to the United States, and Messrs. Charlety and Chan opened accounts at BEA over which they had signature authority, and Mr. Rund **did not have signature authority**. Rund Aff. ¶53.

66.        After Mr. Rund's arrival in Hong Kong in 2008, BEA issued a writ against York Luen for failure to make loan payments due to the bank. Rund Aff. ¶54.

67.     Mr. Rund learned that Mr. Charlety had taken out and defaulted on second mortgages on these two properties and is believed to have used the proceeds for personal purposes and not in business. *Id*.

68.     York Luen owned these properties until 2013 when they were sold for $3,200,000.  Rund Aff. ¶55.

69.     Mr. Rund understood that York Luen would be able to defer taxes by reinvesting the sale proceeds in a business property in Phuket, Thailand. Rund Aff. ¶56.

70.     The proceeds were deposited into China Construction Bank. *Id*.

71.     At the suggestion of Bernhard Weber and Y.M. Cheung, Classic opened an account at UBS in the late 1990s. Rund Aff. ¶57.

72.     In or about 2002 or 2003, Classic transferred its Bay Resources investment, UBS account, its marketing services arrangement with FOB, and other assets to FEV, its successor in interest. Rund Aff. ¶58.

73.     Mr. Rund was the sole owner of FEV. Rund Aff. ¶59. FEV was formed to be a director of FOB Instruments and York Luen, to receive and to continue to hold the Bay Resource investment that had been transferred from Classic Research. *Id*. Additionally, it had a contract to perform marketing services for FOB Instruments after Mr. Rund returned to the United States. *Id*.

74.     Amounts FOB Instruments paid to FEV for marketing services were deposited into its UBS account. Rund Aff. ¶60.

**3. Sark Consultants, Classic Research and Far East Ventures (1990 to Present)**

75.     In the late 1980s or early 1990s, Mr. Rund and a friend formed a company called Sark Consultants ("Sark"). Sark acquired units in Bay Resource Offshore Fund, a **hedge fund**

operating out of the Cayman Islands. At some point in the 1990s, after his co-owner married, Mr.

Rund and his co-owner closed Sark. Mr. Rund's 50% interest was transferred to a new

corporation called Classic Research Ltd. ("Classic"). Gov't Ex. 4 Tr: 62:12 to 64:11 & 93:19  to

94:4.

76.      At the suggestion of Y.M. Cheung and Howard Bilton, Classic ("Classic") was

created, *inter alia,* to receive fees from FOB for marketing services rendered by Mr. Rund. Mr.

Rund was the sole owner of Classic. Gov't Ex. 4 Tr: 30:8-14.

77.      Y.M. Cheung, a Chinese CPA, was FOB's Hong Kong chartered auditor. Gov't

Ex. 4 Tr: 57:21 to 58:4.

78.      Classic was incorporated by the Sovereign Group. Gov't Ex. 4 Tr: 26:2 to 27:3.

79.      The Sovereign Group is a leading independent provider of corporate, private

client and retirement planning services. Among the services it provides are "forming and

managing new corporate structures across all major jurisdictions ("Corporate Formation

Services") and providing the necessary support to assist companies of all sizes to establish and

sustain operations successfully ("Corporate Administrative Services").

https://www.sovereigngroup.com/our-services/

80.      Although Sovereign performed the Corporate Formation Services for Classic,

another company providing similar services was hired to perform the Corporate Administrative

Services. Mr. Rund cannot now recall the name of the other company. Gov't Ex. 4 Tr: 88:5 to

19:3.

*81.*      At some point in the late 1990s, Mr. Rund developed some concerns about the

company performing the Corporate Administrative Services for Classic, so he asked the

Sovereign Group to perform the Corporate Formation and Administrative Services for a new corporation into which Classic's assets would be transferred. *Id*.

82.      Sovereign incorporated a new corporation called Far East Ventures on October 31, 2002. Gov't Ex. 4 Tr: 37:7-11.

83.      After FEV was incorporated, Classic's assets, which included its holdings in Bay Resource and its account at UBS, were transferred to FEV, its successor. Gov't Ex. 4 Tr: 174:3 to 175:6, & 186:12 – 20, & Gov't Ex. 10 at Rund 005112.

### G. Bank Accounts Relevant to this Action

84.      During the Relevant Periods (i.e. 2003 to 2008; 2013 and 2014) the bank accounts giving rise to the Reporting Failures were at BEA, UBS, China Construction Bank ("CCB") and HSBC (the "Relevant Accounts"). Exhibit 21.   **(the "Willful FBAR Penalty Chart")**.

### 1. *The BEA Accounts*

85.      The BEA accounts giving rise to the Reporting Failures are set forth in the Willful FBAR Penalty Chart for the years 2003 through and including 2008.

86.      The account holders of these BEA accounts were FOB Instruments and York Luen.  Rund Aff. ¶30

87.      As noted above, Messrs' Charlety and Chan were the only persons with signature authority over those BEA accounts. Rund Aff. ¶30.

88.      Also as noted above, Mr. Rund **did not** have signature authority over any of those BEA accounts. Rund Aff. ¶30

89.      After he discovered in 2007 that Messrs. Charlety and Chan were misappropriating funds from the BEA accounts to themselves, Mr. Rund attempted to access these accounts.  Rund Aff. ¶50.

90.     BEA refused to give him access even after Mr. Rund became a

shareholder/director of FOB Instruments. *Id.*

### 2. *The UBS Account*

91.     The UBS accounts giving rise to the Reporting Failures are set forth in the Willful

FBAR Penalty Chart for the years 2004 through 2008.

92.     The account holder of the UBS accounts was FEV.  Gov't Ex. 1 at

US_PROD_0006825.

93.     The initial deposit into the FEV account of about $925,000 is believed to have

been transferred from Classic Research, which was the successor in interest to Sark.  *See* Gov't

Ex. 9 at US_PROD_0006624 & Gov't Ex. 10 at Rund 005113.

94.     FEV was organized by Sovereign Trust in or about 2002.  Gov't Ex. 4 Tr: 180:7-

11.

95.     Sovereign Trust is part of a large group of affiliated corporations known as the

Sovereign Group. *See* website at www.sovereigngroup.com

96.     Howard Bilton is the Chairman of the Sovereign Group. *See* Id. "Meet the Team"

97.     Mr. Bilton lived in Hong Kong at the same time as Mr. Rund.  Rund Aff. ¶19.

98.     Mr. Bilton and Mr. Rund were friends.  Gov't Ex. 4 Tr: 180:13-14.

99.     Under the terms of the UBS account set up by Sovereign Trust, Mr. Rund **did not

have signature authority over the UBS account**.  Gov't Ex. 2 at US_PROD_0006762.

100.    The only persons with signature authority over the account were employees of

Sovereign Trust.  *Id.*

101.    Two signatures were required to authorize the disbursement or transfer of funds.

*Id.*

102.     Mr. Rund had a limited power of attorney with respect to the UBS account that permitted him **ONLY** to invest funds in the account.  *Id.*

### 3.  *The China Construction Bank*

103.     The China Construction Bank ("CCB") accounts giving rise to the Reporting Failures are set forth in the Willful FBAR Penalty Chart for the years 2013 and 2014.

104.     The account holder of the CCB account was York Luen.  Rund Aff. ¶56.

105.     York Luen sold its properties in 2013. Rund Aff. ¶55.

106.     The net proceeds of sale were $3,277,000+. *Id.*

107.     These net proceeds were deposited into York Luen's CCB account. Rund Aff. ¶56.

108.     As explained below, between 2010 and 2014 Mr. Rund was represented by no fewer than six (6) tax attorneys and accountants.  *See* Exhibits 18 & 19.

109.     To the best of Mr. Rund's recollection, he was advised by one of his accountants or attorneys that if York Luen intended to reinvest the proceeds of sale in replacement property, then it wasn't' required to report the funds.  Rund Aff. ¶56.

110.     By the time of the York Luen transaction in 2013, Mr. Rund knew that (a) the FBAR is an information report only, (b) it does not give rise to any income tax liabilities, (c) there are substantial penalties for failure to file an FBAR. Rund Aff. ¶64.

111.     By the time of the York Luen transaction in 2013, Mr. Rund (a) had already made a voluntary disclosure to the IRS, and (b) was the subject of an active, intensive and extensive IRS audit (the "Income Tax Audit") and FBAR audit (the "FBAR Audit") covering the years 2003 to 2013 and eventually expanded to 2017. Rund Aff. ¶65.

112.    In 2014 and 2015, Mr. Rund was having a great deal of difficulty finding an accountant to prepare amended and original income tax returns for the periods 2003 to and including 2014, and amended and original FBARs for the same period. Rund Aff. ¶66.

113.    He was also under a great deal of stress as a result of (a) the Hong Kong Litigation, (b) deadlines associated with his obligation to correct his Reporting Deficiencies, (c) an income tax audit covering the years 2003 to 2014 (eventually expanded to 2017), and (d) an FBAR audit covering the same years. Rund Aff. ¶67.

114.    Some of the returns for some of these periods had been prepared. Rund Aff. ¶68.

115.    Some of the returns for some of these periods had been filed. *Id.*

116.    Some of the returns for some of these periods had not been filed. *Id.*

117.    It was even confusing for Mr. Rund's tax advisors and the IRS. By way of example, by letter dated February 21, 2019, undersigned counsel advised Melissa Malone, the IRS Agent conducting the Income Tax and FBAR Audits, that "had been prepared by a CPA . . . "and until recently we believed had been filed." We also confirmed that these FBARs had been provided to her. Exhibit 6.

118.    This letter also indicates that "we did not have the actual statements . . . but have no reason to question the accuracy," and advised that we "intended to use them to prepare and file FBARs." *Id.*

119.    Agent Malone concurred with this approach. Exhibit 7.

## IV.  Argument

### A.  Standard of Review & Burden of Proof

When a court is called upon to decide cross-motions for summary judgment, it must review each motion separately on its own merits to decide whether either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "A plaintiff seeking summary judgment on an issue ... bears the burden of establishing a prima facie case that would entitle the movant to a directed verdict if the issue was uncontested at trial."  *Orozco v. County of Yolo*, 814 F. Supp. 885, 890 (E.D. Ca. 1993), citing 8 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE, § 2727 (1991). Summary judgment is not appropriate if a plaintiff does not produce sufficient evidence:

> A plaintiff who seeks summary judgment and who fails to produce sufficient evidence on one or more essential elements of the claim is "no more entitled to a judgment ... than is a plaintiff who has fully tried the case and who has neglected to offer evidence sufficient to support a finding on a material issue upon which [the plaintiff] bears the burden of proof."  Watts v. United States, 703 F.2d 346, 347 (9th Cir.1983), quoting United States v. Dibble, 429 U.S. 598, 601 (9th Cir. 1970).

*Gray v. Metts*, 203 F. Supp. 2d 426, 431 (D. Md. 2002).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *Libertarian Party of Va. v. Judd*, 718

F.3d 308, 313 (4th Cir. 2013) (citations omitted). A dispute is "genuine" if "a reasonable jury

could return a verdict for the nonmoving party." *Capitol Prop. Mgmt. Corp. v. Nationwide Prop.

*& Cas. Ins. Co*., 261 F. Supp. 3d 680, 686 (E.D. Va. 2017), aff'd, No. 17-1789, 2018 WL

6600219 (4th Cir. Dec. 14, 2018).

> B. **The Evidence, When Viewed in the Light Most Favorable to Mr. Rund, Raises a Genuine Issue of Material Fact about Whether between 2003 and 2008 he Honestly Believed, Based on Advice of his CPA, that he was only Required to Report on FBARs Accounts in his Name and Over Which he had Signature Authority and Whether that Belief was Objectively Reasonable**.

>> 1. **Mr. Rund's FBAR for 2003 Tends to Show that he Discussed His Foreign Accounts with Daniel Reznick, the CPA who Prepared his form 1040, and Was Advised that he Was Required to Report Accounts in His Name and Over Which he had Signature Authority**

**Appendix A** to the Government's memorandum in support of its motion for summary

judgment is a chart that provides a helpful overview of the accounts at issue in this action. It

shows graphically which accounts were never reported, reported late, and timely reported.

According to the Chart, for the 2003 and 2005 calendar years, Mr. Rund timely filed FBARs

reporting only one account: HSBC account 7833. HSBC account 7833 was in Mr. Rund's name

**and** he had signature authority over it. *See* Gov't Ex. 3.

In 2003, Daniel Reznick, a Maryland CPA, prepared Mr. Rund's form 1040. *See* Exhibit

15.  The IRS FBAR transcript for 2003 indicates that Mr. Rund filed this FBAR**.** See Gov't Ex. 3

at US_PROD_0003760.  However, even though the IRS FBAR transcript indicates that Mr.

Rund filed his 2003 FBAR, Mr. Rund believes, and the evidence strongly suggests, that **Mr.**

**Reznick actually prepared it and probably filed it as well**.  *See* Exhibit 16.

Specifically, the second page of the form 1040 signed by Mr. Reznick is dated October 6,

2004 and the FBAR signed by Mr. Rund is dated October 6, 2004 as well. *See* Exhibits 15 & 16**.**

Additionally, Mr. Rund's 2003 Income Tax Return and FBAR are all part of the same file

disclosed by the Plaintiff at US_PROD_0000713 - 0000726. Finally, although Mr. Rund is a nearly 74-year-old man diagnosed with ADHD and cognitive impairment, he believes he would have given his preparers whatever information they requested. Gov't Ex. 4 Tr:172:4 to 173:7.

### 2. The BEA Accounts and UBS Account Were Not In Mr. Rund's Name and He Did Not have Signature Authority Over Them.

Now let's look at the accounts that were not included on the timely filed 2003 FBARs: the **BEA** accounts and the **UBS** account. In 2003 (as well as 2004 to 2008), the **BEA** accounts were in the names of **FOB Instruments** and **York Luen**, and were **not** in Mr. Rund's name. *See* III. Facts as Viewed in the Light Most Favorable to Mr. Rund, *supra*, (hereinafter referred to as "RSOF") 86 & 92.  Additionally, **Messrs Charlety and Chan** had signature authority over these accounts, and Mr. Rund **did not** have signature authority.  *See* RSOF 87, 88, 99, & 100. Likewise, the **UBS** account for the same periods was in the name of **FEV**, and **not** in Mr. Rund's name. RSOF 99.  And only **designated employees** of the Sovereign Group **had signature authority** over the UBS account, and Mr. Rund did **not** have signature authority. RSOF 100 & 101.

Prior to making his voluntary disclosure to the IRS in 2010, Mr. Rund believed that he was required to report on his FBARs only accounts in his name and over which he had signature authority. *See* Gov't Ex. 1 at US_PROD_0006830*.*  Based on the foregoing, it is plausible if not likely that Mr. Reznick had advised Mr. Rund that he would need to report on FBARs account in his name and over which he had signature authority.

### 3. Even Though Foreign Account Box on 2005 Schedule B Checked No, Mr. Rund Still filed a Timely FBAR for His HSBC Account

In 2005, Mr. Rund again reported **his** HSBC account on a timely filed FBAR, only that year his income tax return had been prepared by a different preparer, an enrolled agent named R.

Moore. *See* Gov't Ex. 3 at US_PROD_0003766 – 0003767 & Exhibit 17.  A comparison of the Schedules B on these returns (i.e. 2003 and 2005) is revealing. On the 2003 return prepared by Mr. Reznick the foreign account box in Part III of the Schedule B is checked **YES**, while on the 2005 return prepared by Mr. Moore, the box is checked **NO**. *See* Exhibits 15 & 17.  This suggests that, at least for this action, there is **no evidentiary value in how Schedule B is completed**. This is in contrast to the Schedules B at issue in the *Horowitz* case discussed *infra*.

The forgoing is strong evidence of Mr. Rund's state of mind between 2003 and 2008: He honestly believed that the only accounts that needed to be reported on an FBAR were accounts where he is the account holder and over which he had signature authority. Furthermore, there is equally strong evidence that this good faith belief was objectively reasonable, because it was based on consultations with the CPA whom he hired to prepare his income tax returns. The fact that he cannot now, 20 years later and at a time when he is cognitively impaired, remember those discussions, should not be held against him. At the very least it raises a genuine issue that should be decided by a jury and not by summary judgment.

**C.  Overview of Facts Viewed in a Light Most Favorable to Mr. Rund**

In its Memorandum, the Government makes legal arguments based on facts in its proposed statements of fact **viewed in a light most favorable to it**. When viewed that way, and not surprisingly, it makes a compelling argument for a finding of willfulness. But the story changes when those same facts are viewed in a light most favorable to Mr. Rund, as they must be under applicable law.

**1.  Mr. Rund was Unsophisticated if Not Illiterate in Business and Tax Matters**

Mr. Rund is a man who, though skilled in conceiving new consumer products, has struggled with ADHD his entire life, and dropped out of school at the age of 18 to drive a taxi

cab in New York City. RSOF 5 – 24.  He moved to Hong Kong at the age of 30 and never had

any formal business, tax, or accounting training. RSOF 28 – 33.  He was and is unsophisticated if

not illiterate in business and tax matters. RSOF 33.  The assertion that his company, FOB

Instruments, was making $1 million profit per year in the early 2000s is irrelevant, unfairly

prejudicial, and supported only by a portion of a UBS business record that (a) contains multiple-

level hearsay, (b) is not signed **anywhere** by Mr. Rund, (c) was never seen by Mr. Rund, and (d)

does not even clearly disclose the purported source of the information.  *See* Gov't Ex. 3 at

US_PROD_0006720.

### 2. Mr. Rund Conferred with a Group of Professional Advisors Who Were Honest and Qualified

Mr. Rund came of age in Hong Kong. He lived there full-time from the age of 30 until the

age of 50. RSOF 28 & 41.  So, it's only natural that his circle of advisors would be professionals

who also lived in Hong Kong. His circle of advisors in Hong Kong included Bernhard Weber, a

banker with UBS, Howard Bilton, the chairman and founder of Sovereign Group, an

international corporate management services organization, and Y.M. Cheung, the chartered

auditor of FOB Instruments and York Luen. RSOF 35.  Mr. Rund trusted these gentlemen, and

there is nothing to suggest that they were dishonest or unqualified. *Id*.  During his deposition, Mr.

Rund testified, under oath, that the business structure of FEV was recommended by Y.M.

Cheung, FOB Instrument's chartered auditor, and states, emphatically and credibly, that "they

wouldn't have done it if it was illegal." *See* Gov't Ex. 4 at pg. 57 ln. 14 – pg. 58 ln. 18. Clearly

Mr. Rund was justified in relying on the advice of FOB Instrument's and York Luen's outside

CPA and auditor.

### 3. UBS Paperwork Was Never Signed or Seen by Mr. Rund and is also Ambiguous, Unclear, and Unreliable

The Government argues that the UBS opening paperwork calls Mr. Rund the "client." That's not so clear, but even if that were the case, Mr. Rund never signed, received a copy or even saw any of this paperwork. Rund Aff. ¶¶ 69 & 70.  The account was administered by Sovereign Trust. RSOF 100.  Sovereign Trust is a leading company in providing international corporate services, including administration services of the type used for FEV. RSOF 95.  And is it so surprising that Mr. Rund's friend, Bernhard Weber, who worked for UBS, would recommend opening a UBS account?

The Government notes that UBS paperwork describes Mr. Rund as "secretive," and states that he opened the account for "discretion" and that he needed "confidentiality." It also contains an email from a UBS client advisor who asks that the salutation "not mention the client name." First, the source of and basis for these descriptions is unknown. And what do these terms in this context even mean? There's no testimony except for Mr. Rund who did not sign any of these documents, or receive a copy, or for that matter even see them. Rund Aff. ¶ 70. Mr. Rund testified that he had nothing to do with the request to change the salutation on the account, and speculates that Mr. Charlety may have been responsible.  Gov't Ex. 4 at Tr: 48:2 to 49:7.

### 4. Based on Mr. Rund's Understanding About His FBAR Filing Obligations, Control Was Not a Factor

The Government argues that Mr. Rund received $675,000 from the FEV UBS account for his business investments and that's evidence of control. We agree that he received $675,000, but as noted, his belief was that FBAR filing obligations were imposed on account holders who have signature authority. Gov't Ex. 1 at US_PROD_0006830.  Mr. Rund testified that the money was used to try to save FOB Instruments at a time when its assets had been seized by a Chinese court

and were about to be auctioned off. Gov't Ex. 4 at pg. 52 lns. 2-9 & RSOF 58.  Furthermore, as demonstrated earlier, Mr. Rund did not equate such "control" over an account with an obligation to include it on an FBAR.

### 5. Government will not be Offering Expert Testimony on Tax Avoidance, but Even if it did, Nothing Improper in Avoiding Taxes

The Government argues that Mr. Rund's following the advice of Y.M. Cheung, his corporate CPA, to reduce taxes, or hiring the Sovereign Group to incorporate FEV, or paying Sovereign to administer FEV is evidence of willfulness. Once again, this is not the case when those facts are viewed in a light most favorable to Mr. Rund. A desire to avoid tax is not improper. As Justice Learned Hand observed in *Helvering v. Gregory,* 69 F. 2d 809, 810 (2d Cir. 1934) "anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Internal citations omitted.*

### 6. FEV Was Accurately Disclosed in Voluntary Disclosure Prepared by Mr. Rund's Lawyer

The Government asserts that Mr. Rund "hides the ball" about FEV in his voluntary disclosure. We strongly disagree. With respect to FEV, Mr. Rund's voluntary disclosure, which was drafted by his legal advisor, states, in relevant part, that "since FEV's inception in 2003, Sovereign Trust Hong Kong, Ltd. has always administered FEV **in trust for Mr. Rund." (emphasis supplied).** Gov't Ex. 1 at US_PROD_0006823**.**  This statement, which was drafted by Mr. Rund's lawyers, is accurate.

### D. *Horowitz* Distinguished

The Government relies heavily on the *United States v. Horowitz*, 978 F.3d 80 (4th Cir. 2020), but based on the 4th Circuit's analysis of relevant factors, *Horowitz* is clearly distinguishable:

Peter and Susan Horowitz were highly educated professionals. *Horowitz*, 978 F.3d at 82. Peter was a doctor who had spent his career working as an anesthesiologist, while Susan received a Ph.D. in clinical social work and worked as a public health analyst at the U.S. Department of Health and Human Services. *Id.*

In contrast, Mr. Rund struggled with ADHD his entire life, dropped out of school at the age of 18, drove a cab, and moved to Hong Kong at the age of 30.  RSOF 5 – 24 & 28.

The Horowitz's were wage earners. *Horowitz,* 978 F.3d at 82. Mr. Rund started and operated several foreign businesses in Hong Kong and China, so it's natural he would have foreign accounts in those countries. And his friend and banker was Bernhard Weber, a UBS employee, so it's natural he'd have an account at UBS.  *See, e.g.*, RSOF 24-25, 30-32, & 37.

The Horowitz's invested savings from their wages in a UBS Swiss bank account. *Horowitz,* 978 F.3d at 83.  Mr. Rund's bank accounts were associated with active businesses and rental real estate, as well as investments.  *See, e.g.*, RSOF 86, 92, & 104.

The Horowitz's did not disclose their foreign bank account to their return preparer, but instead discussed the tax consequences with unidentified friends in Saudi Arabia. *Horowitz,* 978 F.3d at 86. Mr. Rund disclosed his accounts and was advised by qualified professionals. Gov't Ex. 4 at Tr: 122:9-21.

Dr. Horowitz signed an agreement with Finter Bank and made elections that "allowed U.S. clients to eliminate the paper trail associated with the undeclared assets and income."

*Horowitz*, 978 F.3d at 83. Mr. Rund did not sign any of the account paperwork and did not even see it. Rund Aff. ¶¶ 69-70.

The Horowitz's had used the same preparer since the late 1970s, always answered the foreign account question on the Schedules B **NO**, and claimed they never read their returns. *Horowitz*, 978 F.3d at 84 to 85. Between 2003 and 2008, Mr. Rund used two different preparers. *See* Exhibit 18.  On returns prepared by Mr. Reznick, the foreign account questions were answered **YES**, and a timely FBAR disclosing Mr. Rund's personal HSBC account was filed. Exhibits 15 & 16. On the returns prepared by Mr. Moore, the foreign account questions were answered **NO**, but a timely FBAR disclosing Mr. Rund's personal HSBC account **was still filed**. See, e.g., Exhibit 17 & Gov't Ex. 3 at US_PROD_0003766-0003767.

In deciding that the Horowitz's acted willfully as a matter of law, the Court based its decision on the fact that they had "some unspecified conversations with friends in Saudi Arabia in the late 1980s . . . [but] . . . were reckless in failing to discuss the same question with their accountant at any point over the next 20 years." *Horowitz*, 978 F.3d at 89. As noted, there is strong evidence that Mr. Rund discussed these accounts with his preparer.

The Court also relied on the fact that there were elections on the deposit agreement that Mr. Horowitz signed intended to eliminate a paper trail. Mr. Rund never signed any of the BEA or UBS deposit agreements, and never saw them.

Finally, the Court relied on the fact that all of the foreign account questions on the Horowitz's Schedules B were checked NO. *Horowitz,* 978 F.3d at 90.  On Mr. Rund's 2003 return the question is answered YES, and on the 2005 return it's answered NO, but he filed timely FBARs for both years.

The *Horowitz* case has a very different set of facts than Mr. Rund's case.

### E.  BEA Denied Mr. Rund Access after the Fraud was Discovered.

In addition to the facts that (a) FOB Instruments and York Luen were the BEA account holders and Mr. Rund was not, and (b) Messrs. Charlety and Chan were authorized signers of the BEA accounts, and Mr. Rund was not, BEA also refused to give Mr. Rund access to the accounts after he discovered Messrs. Charlety and Chan's fraud. RSOF 87 & Gov't Ex. 4 at pg. 81 ln. 1 – pg. 83 ln. 8. Mr. Rund had no control over these accounts.  RSOF 88.

### F.  China Construction Bank

#### 1.  Post Voluntary-Disclosure FBAR Filings (2009 to 2012)

Once Mr. Rund made his voluntary disclosure on April 8, 2010, he was aware that (a) the FBAR is an information return only, and there is no tax associated with it, (b) but that if you willfully fail to file complete and timely FBAR the penalties are severe (i.e. the greater of $100,000 or 50.0% of the aggregate high balances in the accounts for each calendar year, (c) he had already made a voluntary disclosure to the IRS, (d) the IRS was auditing all of his income tax returns from 2003 through the most current date, and (e) the IRS was investigating all of his FBAR filings for the same period. RSOF 110 & 111. For these reasons, it would make no sense for Mr. Rund to **willfully** fail to disclose foreign financial accounts.

Between the date of the voluntary disclosure in April of 2010 and June of 2014 (the date the 2013 FBAR was due), Mr. Rund had been represented by three (3) attorneys (Peter Thorne, Weisberg Kainen, and Mark Schweighofer) and three (3) CPAs (Peter Stratos, Alan Kirzner and James Magno). *See* Exhibits 18 & 19.  Why were there so many changes in representatives? Mr. Rund's ADHD did not help. As Dr. Wilken noted, many people find it maddening dealing with people with ADHD, because they don't listen or follow through. RSOF 21.  But it wasn't entirely due to Mr. Rund's ADHD. Obtaining records for 15 different bank accounts for a twelve (12)

year period from banks in China while litigation is pending with IRS deadlines constantly

looming would be daunting for anyone, much less a person with severe ADHD.

And as one professional representation ended, it would often take time for Mr. Rund to

find a new representative so there would be a gap. Additionally, the new representative would

need to get up to speed with a very complex case. Meanwhile the Hong Kong Litigation was

proceeding apace, requiring Mr. Rund to travel to China as often as twelve (12) times per year.

RSOF 60 & 61.

Mr. Rund's FBAR filings for 2009 to 2012 were timely and complete. Government

Appendix A.  But by 2013, the strain was taking its toll, and the wheels came off. In addition to

his ADHD, and losing the battle to save his business in the Hong Kong Litigation, and dealing

with the demands of the IRS audits, Mr. Rund was also diagnosed with depression, and

eventually, recurrent stage 3 prostate cancer. This is the setting when it came time to file the 2013

and 2014 FBARs.

### 2.  2013 FBAR

In September of 2013, York Luen sold its two (2) remaining properties. RSOF 68. The

net proceeds from the sale were $3,277.466. *Id*. These proceeds were deposited into a new

bank—The China Construction Bank. RSOF 70. Mr. Rund opened a new account because of all

the problems he was having with BEA.

When the properties were sold, Mr. Rund intended that the proceeds would be reinvested

in replacement real estate. RSOF 69. It was his understanding, based on a conversation with one

of his accounting advisors, that the transaction would not need to be reported if the proceeds

were reinvested. Gov't Ex. 4 at Tr:119:6  to 122:7. Mr. Rund cannot now recall who gave him

this advice but is sure he received it. RSOF 109. Though the accountant was probably using the

term reporting to refer to reporting for income tax, and not reporting for FBAR purposes, it's clear that Mr. Rund frequently confused these references. *See, e.g.*, Exhibit 10. Based on advice he received that the amount was not reportable, Mr. Rund conflated the term reportable for income tax purposes with reportable for FBAR purposes. Rund Aff Para.56.

### 3. 2014 FBAR

The 2014 FBAR was admittedly late. Mr. Rund did experience a problem accessing the electronic system. Gov't Ex. 4 at Tr: 132:19 to 133:9. But as noted, it makes no sense that Mr. Rund would **willfully** file this FBAR late. We submit that a more likely explanation is that with his ADHD, coupled with depression, the stress of the Hong Kong Litigation, the IRS investigations swirling around him, loss of professional representation and difficulty/delay in finding new representatives, he was totally overwhelmed. RSOF 112 & 113.

As Dr. Wilken explained, symptoms of ADHD typically include inattention, distractibility, disorganization, careless mistakes with work or other tasks, trouble holding attention on tasks, not listening when spoken to, not following through on instructions, failing to complete work, trouble organizing tasks and activities, avoiding tasks that require mental effort over a long period of time, being easily distracted and forgetful, and tangentiality. RSOF 18. Furthermore, as people with ADHD get older, their symptoms tend to become more difficult to manage. RSOF 20. And ADHD symptoms can be exacerbated by illness, stress, depression, loneliness, and insomnia. RSOF 22. Mr. Rund was experiencing all of these symptoms during this period. Rund Aff. ¶¶84 – 87.

### V.   Conclusion

In *Turpin v. United States*, 970 F.2d 1344, 1350 (4th Cir. 1992), a case involving the issue of willfulness in the context of the trust-fund recovery penalty, the Court observed that

"whether someone has acted willfully is an inquiry "'necessarily directed to the state of the responsible person's mind.' " *(internal citations omitted)* As such, [willfulness] is the quintessential jury issue. Here, the jury specifically found that appellant had not acted willfully in failing to pay over the federal taxes withheld from Black Maverick's employees. While ordinarily an officer of a corporation knows or absent reckless disregard should know whether or not employee withholding taxes are being paid over to the IRS, the jury was entitled in the unusual circumstances of this case to conclude otherwise.

Like *Turpin*, the circumstances of this case are unusual, to say the least. Defendant submits that there is a genuine issue of material fact as to whether any (and if so, which) of Mr. Rund's Reporting Failures are willful. For these reasons, it is respectfully requested that the Court deny the Government's motion for summary judgment.

Respectfully submitted this 15th day of December, 2023.

/s/ James D. Skeen
James D. Skeen (Va. Bar No.: 79500)
Stephen P. Kauffman (Pro Hac Vice)
Terry L. Goddard Jr. (Pro Hac Vice)
SKEEN & KAUFFMAN LLP
9256 Bendix Road, Suite 102
Columbia, MD 21045
Phone:          (410) 625-2252
Fax:             (410) 625-2292
jskeen@skaufflaw.com
skauffman@skaufflaw.com
tgoddard@skaufflaw.com

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November, 2023, I have caused a copy of

the foregoing to be sent to the individuals and/or entities listed below by electronic mail, as

agreed by the Parties in advance, as follows:

NISHANT KUMAR
Trial Attorney, Tax Division
U.S. Department of Justice Post Office Box
227 Washington, DC 20044

/s/ Terry L. Goddard Jr.
Terry L. Goddard Jr.