UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA
*Plaintiff,*

v.

Case Number 1:23-cv-00549

RICHARD M. RUND,
*Defendant.*

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff United States of America's ("Plaintiff" or "the Government") Motion for Summary Judgment (ECF 32) and Defendant Richard Rund's ("Defendant") Motion for Summary Judgement (ECF 35). For the reasons discussed below, the Government's motion will be granted, and Defendant's motion will be denied.

## I.    BACKGROUND[1]

The Bank Secrecy Act requires United States taxpayers to report "any financial interests they have in any bank, securities, or other financial accounts in a foreign country" to the Internal Revenue Service on an annual basis ("IRS"). *United States v. Williams*, 489 Fed. App'x 655, 656 (4th Cir. 2012) (citing 31 U.S.C. § 5314(a)). Individuals must file a completed Report of Foreign Bank and Financial Accounts ("FBAR") "on or before June 30 of each calendar year" for each foreign account which held over $10,000 in the prior calendar year. 31 U.S.C. § 5314; 31 C.F.R. § 103.27(c); 31 C.F.R. §§ 1010.350, 1010.306(c). Schedule B of the federal income tax form (Form 1040) puts taxpayers on notice of those reporting obligations. More specifically, Schedule B asks the taxpayer a simple "Yes" or "No" question: whether or not they have an "interest in or signature

---

[1] The facts described herein are undisputed unless otherwise indicated.

or other authority over a foreign bank account"? ECF 33 at 13. Individuals who answer "Yes" are then directed to the FBAR form, in which they must list the countries where their foreign accounts are located. *Id.*

Rund is a U.S. citizen who built a career as an inventor and international businessman in Hong Kong. ECF 1 ¶¶ 3, 10. For decades, Rund held a financial interest in several foreign accounts,[2] including at UBS Switzerland and the Hong Kong branches of the Bank of East Asia, HSBC Bank, and China Construction Bank Asia. *Id.* ¶ 21. For calendar years 2003 through 2008, 2013 and 2014, Rund maintained high balances in those accounts, often substantially over $10,000. *Id.* ¶ 28. Rund's federal income tax returns for 2003 through 2008, 2013 and 2014, however, did not accurately describe his foreign financial interests. *Id.* ¶ 29. Despite answering "Yes" to the Schedule B question on his returns in the calendar years 2003, 2004, 2013, and 2014, Rund failed to timely and completely submit an FBAR during these years and omitted many of these accounts from his disclosure. *Id.* ¶¶ 29, 35. From 2005 through 2008, Rund answered "No" to the Schedule B form entirely. *Id.* ¶ 35.

On December 5, 2019, the IRS notified Rund by letter that it was seeking penalties against him under 31 U.S.C. § 5321(a)(5)(C) for his FBAR violations. *Id.* ¶ 42. In 2021, the Government assessed penalties totaling $2,915,663 against Rund due to his willful failure to timely report the omitted foreign accounts for the calendar years discussed above. *Id.* ¶¶ 43-44. The Government filed this action to collect those penalties, and it has now moved for summary judgement against Rund. ECF 33. Rund has filed a cross-motion for summary judgement, claiming that (1) his reporting failures were "due to Reasonable Cause or subject to a Non-Willful Penalty," (2) even if

---

[2] Defendant argues that he did not have signature authority over several of these accounts (ECF 39 at 39); however there is no genuine dispute of material fact that Rund was a beneficial owner of, exercised control over, or had a significant financial interest in the accounts at issue.

his conduct was willful, the penalty is an excessive fine in violation of the Eighth Amendment of the United States Constitution, and (3) the statute of limitations on FBAR claims bars the imposition of penalties for some of the reporting periods at issue. ECF 36 at 2.

Rund has not shown any genuine dispute of material fact as to whether his failure to accurately report these accounts was willful. Neither has he shown that the FBAR penalties assessed constitute fines within the meaning of the Eighth Amendment or, even if they were, that they would be excessive. Finally, Rund waived any statute of limitations defense by repeatedly giving consent to the Government to extend the penalty assessment deadline for the calendar years at issue.[3] This Court will therefore grant the Government's motion and deny Defendant's motion.

## A. Factual History

In 1982, Rund moved to Hong Kong, where he resided until 2000. ECF 1 ¶ 11. While there, he started a company called FOB Products that engaged in the sale and export of appliances. ECF 33 ¶ 27. In 1999, Rund was the sole shareholder of the company and had signature authority over its accounts. *Id.* ¶ 28. That year, Rund closed FOB Products and transferred its assets to FOB Instruments, Ltd. *Id.* ¶ 31. Around this time, Rund also purchased an entity known as York Luen. *Id.* ¶ 29. York Luen owned an apartment that Rund wished to buy as well as other Hong Kong real estate. *Id.* ¶¶ 29-30.

In 1999, FOB Instruments became the owner of York Luen. *Id.* ¶ 32. That same year, Rund signed a "Declaration of Trust," transferring control of FOB to his friend Pierre Charlety. *Id.* ¶ 33. The Declaration designated Rund as the "Beneficial Owner" of FOB's shares and listed Charlety

---

[3] There is also no indication that the deadline at issue here is jurisdictional and, thus, could not be waived. Fed. R. Civ. P. 8(c)(1); *see* Opp'n to Def. Mot. Dismiss at 11-13 ("Only if the statutory text 'plainly show[s] that Congress imbued a procedural bar with jurisdictional consequences' should a court treat a rule as jurisdictional.") (quoting *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)). The Court agrees with the Government that Rund's signed consents to extend the six-year FBAR deadline under U.S.C. § 5321(b)(1) are valid waivers.

as the "nominee for the Beneficial Owner." *Id.* ¶ 34. Charlety became the listed owner of 95% of the shares in FOB. *Id.* For the next eight years Rund gave Charlety instructions on daily operations, received regular cash flow statements for the account, remained in charge on all major decisions and expenditures, and was aware of several bank accounts held by FOB and York Luen. *Id.* ¶ 36. For example, around 2003 or 2004, York Luen sold an apartment it owned. *Id.* ¶ 37. Rund then instructed Charlety to transfer one-third of the proceeds from the sale from a York Luen account to a UBS Switzerland account (ending in -0486) under the name of Far East Ventures, Ltd. ("FEV"), a Mauritius company. *Id.* ¶ 39. Rund made other requests for Charlety to transfer money from a York Luen account to the UBS account under FEV's name, including a request for the transfer of more than one million Hong Kong dollars. *Id.* ¶¶ 40, 42.

FOB Instruments also made $25,000 monthly payments into FEV's UBS account. *Id.* ¶¶ 9-10. Rund paid Sovereign Mangers, Ltd. to set up FEV and provide it with a director.[4] *Id.* ¶ 12. Then around 2003, UBS opened the account under FEV's name. *Id.* ¶ 6. The bank's paperwork lists Rund as the client, identifies Rund as the beneficial owner of the assets, and the biographical data for the client profile matches Rund's. *Id.* ¶¶ 14-16. Rund also requested funds from the UBS account for his business investments at least once and used a credit card associated with the UBS account for some personal expenses. *Id.* ¶¶ 18, 20, 22. Lastly, when the UBS account closed in 2010, Rund directed its funds to be moved into his personal bank account at HSBC. *Id.* ¶ 23.

Rund later testified that the purpose of moving money from FOB in Hong Kong to the UBS account was to "reduce the tax liability of FOB in Hong Kong." ECF 39 ¶ 9. While Rund did not state why this UBS account was not in his name, he did assert that the account was opened under

---

[4] Neither the Government nor Defendant state in what year Rund paid Sovereign Mangers for this service.

FEV's name "on the advice of, Y.M. Cheung, FOB Instruments' chartered auditor, and Howard Bilton of Sovereign," who he viewed as "trusted individuals." *Id.* ¶ 11.

In 2007, Rund discovered that Charlety had been stealing from FOB Instruments. ECF 33 ¶ 44. Rund then reiterated to the Bank of East Asia ("BEA"), where FOB accounts were located, that "the 100% shareholders of all the shares of the Company is Rund himself." *Id.* ¶ 45 (sic). In 2009, Rund sued Charlety in Hong Kong, beginning a years-long legal battle ("The Hong Kong Litigation"). *Id.* ¶ 46; *see also* ECF 36 ¶ 46. That same year, Rund became a director and owner of York Luen. ECF 43 ¶ 49.

During this time, Rund repeatedly failed to timely report his interests in his foreign accounts as required. Rund did not list the UBS account or any foreign accounts in Switzerland on Schedule B of his Form 1040 in 2003. Nor did he mention the UBS account on any FBAR from 2003-2009.  ECF 33 ¶¶ 57-58. Bank of East Asia also held numerous accounts listed under the names FOB and York Luen. *Id.* ¶ 60. Rund did not list several of these accounts (including the accounts numbered -9342, -0766, and -0024) on any of his FBARs filed before 2009 nor did he list others (the BEA accounts numbered -1467 or -1697) on any of his FBARs whatsoever. *Id.* ¶¶ 67-70. He admitted that the BEA accounts were a "gray area" where he was unsure of his reporting requirements; however, he does not remember asking his return preparers whether he needed to disclose them during the period from 2003-2008. *Id.* ¶¶ 60-61. Rund also did not report several accounts held at HSBC Bank in Hong Kong. *Id.* ¶ 74. Rund held a personal account at HSBC (-7833) for which he failed to submit an FBAR in 2007, despite reporting it in previous years. *Id.* ¶ 71. Rund also failed to submit a FBAR for another personal HBSC account (-4833) in 2008. That account held around 3.5 million Hong Kong dollars at the time. *Id.* ¶¶ 73-74.

In 2010, Rund learned that UBS Switzerland was closing his account and that the bank was under investigation by the U.S. Department of Justice. ECF 33 ¶ 52. Rund then joined the Offshore Voluntary Disclosure Program ("OVDP"), an IRS program designed to allow citizens to voluntarily disclose previously unreported foreign accounts. *Id.* ¶¶ 50-51; *see* Internal Rev. Manual § 4.63.3.1, *et seq.* Rund disclosed the UBS account for the first time during the program. When questioned about the account, he did not recall whether he had ever mentioned it to his tax return preparer before 2009, nor did he assert that his failure to report the account was based on bad advice received from his return preparer. *Id.* ¶¶ 56, 59. Regarding FEV, Rund still denied any legal ownership, interest, control, or other relationship to the entity in his letter to OVDP. *Id.* ¶¶ 53-54; *see* Govt. Ex. 1.

Rund participated in OVDP from 2010 through 2016 and was required during this time to provide the IRS with "truthful, timely, and complete" information regarding his foreign accounts. *Id.* ¶¶ 63-64. In 2013, Rund opened two more accounts in the name of York Luen with China Construction Bank ("CCB"). *Id.* ¶ 76. While still in OVDP, Rund continued to leave several accounts unreported. *Id.* ¶¶ 80, 86. Rund failed to report the CCB accounts until July 2016, which he states was due to a mistaken belief that he would be rolling proceeds from his CCB account into another account before the reporting requirements became applicable. *Id.* ¶¶ 80, 82. Rund also does not remember ever mentioning the CCB account to his tax preparer. *Id.* ¶ 84. Then in 2014, Rund completely failed to submit an FBAR. *Id.* ¶ 87. He did not file his 2014 FBAR until 2016, a year past the deadline. *Id.*

Rund did not file any FBAR for 2004, 2006, 2007, or 2008 until 2019.[5] *Id.* ¶ 65.

---

[5] Rund asserts that the returns were filed late because "until recently [Rund] believed they had been filed." ECF 39 ¶ 65. The Court need not resolve the dispute whether this fact is supported by the Record, as even taking the evidence in the light most favorable to Rund, there is every indication that his violation was at least reckless and therefore, willful. *See infra* Section III(A)(i).

Ultimately, in 2021, the IRS found that Rund had willfully violated his FBAR reporting requirements "at least 43 times during the years 2003-2008, 2013, and 2014." *Id.* ¶¶ 102, 103. Rund was assessed a penalty of $2,915,663 for his violations. *Id.* ¶ 102.

### B. Procedural History

In April 2023, the Government brought this action under 31 U.S.C. § 3711 to collect the outstanding penalties assessed against Rund. ECF 1 at 1. The Government alleges that Rund willfully violated the reporting requirements for his foreign bank accounts and "incurred but failed to pay [the] civil monetary penalties" he was assessed pursuant to 31 U.S.C. § 5321 (a)(5). *Id.* at 2. Rund filed an answer to the complaint and asserted six affirmative defenses against the Government's claim for relief.[6] ECF 5 at 4. Rund also raised a constitutional defense, arguing that the imposition of $2,915,663 in penalties for his conduct violates the Eighth Amendment's prohibition on excessive fines. *Id.* at 5.

After discovery, the Government and Rund filed cross-motions for summary judgement. ECF 33; ECF 36. Oral argument has been held, and the Court is now prepared to resolve the motions.

## II.   LEGAL STANDARD

Summary judgment is proper where the moving party has demonstrated that "there is no genuine issue of material fact," and the movant deserves judgement as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Tech. Apps. & Servs. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996). "A material fact is one 'that might affect the

---

[6] Those defenses are: (1) non-willful conduct; (2) reasonable reliance on the advice of professional tax advisors; (3) improper termination and/or denial of entry from the OVDP program; (4) statute of limitations for assessment of penalties; (5) statute of limitations for the Government's claims; and (6) the IRS' lack of managerial approval required by 6751(b) of the Internal Revenue Code of 1986. While Rund lists each of these defenses in his answer, he fails to address the third or sixth defense at any other point, including in his motion for summary judgement.

outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248). Where, as here, the Court is faced with cross-motions for summary judgment, the Court must review each motion separately, taking the facts in the light most favorable to the nonmovant. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## III.    ANALYSIS

### A.  Rund is liable for his willful violations of the FBAR reporting requirements

As discussed above, the Bank Secrecy Act requires United States citizens to report any financial interests they have in foreign bank accounts with aggregate balances over $10,000 to the IRS. 31 U.S.C. § 5314(a)). The Secretary of the Treasury has the power to assess civil penalties against individuals who fail to report these interests. 31 U.SC. § 5321(a)(5). For a "willful" FBAR violation, Section 5321 (a)(5)(C) allows the Secretary to assess a maximum penalty of the greater of either i) $100,000 or ii) 50% of the account balance at the time of the reporting violation. ECF 33 at 27. The penalty for a non-willful violation is $10,000 per year. ECF 36 at 2.

The Fourth Circuit has held that the statutory term "willful" encompasses both knowing and reckless violations of the civil FBAR requirements. *See Williams* 489 Fed. App'x at 658 ("Importantly, in cases 'where willfulness is a statutory condition of civil liability, [courts] have generally taken it to cover not only knowing violations of a standard, but reckless ones as well.'") (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)). In the civil context, recklessness is assessed using is an objective standard. *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020). It addresses only one's "[failure] to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

Under this objective recklessness standard, the Government must prove that the defendant: "(1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily." *Id.* (citing *Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018)).

In *Horowitz*, the Fourth Circuit found that the defendants recklessly disregarded their reporting requirements based on their failure to mention their foreign bank account to their tax preparer. *Id.* The defendants "discussed their tax liabilities for their foreign accounts with their friends," "demonstrat[ing] their awareness that the income could be taxable," but did not "have the same conversation with the accountants they entrusted with their taxes." *Horowitz* 361 F. Supp. 3d 511, at 528. This failure, "[d]espite numerous red flags," to "ma[k]e a simple inquiry to their accountant" was a reckless violation of the FBAR requirements. *Id.* at 90; *see also Williams* 489 Fed. App'x at 659 (concluding that a defendant who signed his tax return, declared that its contents were "true, accurate, and complete," and still failed to pay attention to what was ultimately reported in the return was "willfully disregard[ing]" his obligations.").

Rund argues that the penalty assessed by the IRS is improper because he is only subject to non-willful reporting penalties. *Id.*; *see* 31 U.SC. § 5321 (a)(5). This argument fails because the undisputed facts demonstrate that in 2003-2008, 2013, and 2014, Rund either knowingly or recklessly failed to file FBARs for numerous foreign accounts.

The undisputed facts establish that Rund knew of the reporting requirements for foreign bank accounts in general, since he had previously filed FBARs in 2001 and 2002. ECF 33 at 19. The only potential dispute is whether Rund willfully violated these requirements for the specific bank accounts and years at issue. Rund argues that his reliance on his advisors establish that his reporting violations were non-willful, as he "honestly believed" that he was only required to report

9

the accounts in his name, over which he had signature authority. ECF 39 at 39. However, for each account listed below, the facts establish that Rund: (i) had a financial interest in the account which would subject him to FBAR requirements; and (ii) knew of his reporting requirements and intentionally or recklessly disregarded them.

### i.    2004-2008, UBS Account

Although the paperwork for the UBS account lists Rund as the client, he insists that he never signed or saw that paperwork and points out that he lacked "signature authority" over the account. *Id.* at 40.  That is largely beside the point. Even setting aside the paperwork establishing Rund as the account's client, the undisputed facts show that Rund had an interest in and authority over the UBS account. As discussed earlier, whether he maintained signature authority, Rund made requests for funds from the account, directed transfers, and was listed as the "beneficial owner" of the account. Rund therefore "clearly ought to have known" that he held an interest in the UBS account that triggered reporting requirements.  *Horowitz*, 978 F.3d at 89.

Like the defendants in *Horowitz*, Rund worked with trusted tax preparers, held significant funds in a foreign account, and failed to even mention these interests to his tax preparers.[7] And Rund, *unlike* the *Horowitz* defendants, cannot claim he had no knowledge of the FBAR requirements. ECF 33 at 19. His earlier FBARs establish that he *did* know certain requirements existed to report one's interest in foreign bank accounts. Additionally, like the defendant in *Williams*, Rund submitted his tax returns and signed them under penalty of perjury but failed to submit the additional required FBAR. Despite answering "Yes" to the Schedule B question on his returns in 2003 and 2004, Rund did not then disclose his UBS accounts. From 2005 to 2008, Rund answered "No" to the question entirely. ECF 1 ¶¶ 29, 35. In preparing these returns, Rund

---

[7] While Rund asserts this is a genuine dispute of fact, there is no documentary evidence that establishes that he discussed the account with his tax preparers prior to 2009.

recklessly disregarded his reporting obligations. Even assuming Rund believed that he was only required to report accounts over which he had signature authority, he could have found out for certain with "minimal effort." *Horowitz*, 978 F.3d at 90. His failure to do so was at the very least reckless.

### ii.     2003-2009, BEA Accounts

The undisputed facts also establish that Rund had a financial interest in the Bank of East Asia accounts held by FOB Instruments and York Luen. Rund was a beneficial owner of FOB Instruments and enjoyed considerable control over the direction of its assets and accounts. The record also shows that FOB became the owner of York Luen around 1999, and Rund directed the transfer of York Luen funds on several occasions from that time until 2009. Furthermore, in 2019 Rund eventually disclosed his interest in some of these BEA accounts on his belated FBARs for 2004, 2006, 2007, and 2008. ECF 33 at 19. His eventual reporting of these accounts (though still an incomplete reporting of his interests at BEA) demonstrates that he did in fact have a financial interest in the accounts held by FOB and York Luen. *Id.* at 20.

As with the UBS accounts, Rund's reporting failures here were reckless. Rund has not established that he mentioned his interests in these BEA accounts to his tax preparers, and he already knew of the FBAR requirements from his previous disclosures. His failure to discuss these accounts, despite his reported denial of his "ownership interests in the entities controlling these accounts," amounts to recklessness. *Id.* at 22 (quoting Statement of Facts 55). On Rund's own admission, these accounts were a "gray area" to him. *Id.* That uncertainty is more than enough to render his failure to seek guidance reckless.

### iii.    2007-2008, HSBC Accounts

Rund also held several personal accounts at HSBC Bank. He properly reported at least two of those accounts at times, which shows he was aware of the disclosure requirement. Nevertheless, Rund failed to submit an FBAR for his account ending in -7833 in 2007, and for his account ending in -4833 in 2008. The second of these two accounts had a balance of around $3.5 million Hong Kong dollars at the time. Each of these failures can certainly be seen as reckless given Rund's acknowledgement of his financial interests in the account and previous FBAR filing.

### iv.    2013, CCB Accounts

 Rund also held a financial interest in two separate accounts with CCB. These accounts were opened under the name York Luen in 2013, and Rund does not contest that he had an obligation to report the accounts. Instead, Rund argues that the accounts were omitted on his 2013 FBAR because he believed that he would "roll[] any proceeds" from the CCB accounts into another account before the reporting requirement deadline. *Id.* at 23. Whatever his original intent, he would have known otherwise by the time of his reporting obligations. The FBAR for 2013 was due on June 30, 2014—at that time, Rund knew that the reinvestment had not happened. *Id* at 24. At the very least, he could have asked his tax preparers at that time whether he still had a reporting obligation for the CCB accounts, even if he was intending to eventually reinvest the money.

As the Government also notes, Rund was actively participating in the Offshore Voluntary Disclosure Program in 2013 and 2014. *Id.* Accordingly, this was a time Rund should have been even more cognizant of his reporting requirements and careful with his omissions. *Id.*; *see also Bedrosian* 912 F.3d (discussing a taxpayers' reckless failure to file a complete FBAR when he is already under scrutiny from the government) (citing *Williams,* 489 F. App'x 656).

12

### v.      2014, CCB and HSBC Accounts

Despite his financial interest in  two China Construction accounts and three personal HSBC accounts, Rund also failed to file his 2014 FBAR on time. Once again, this failure occurred during Rund's participation in the Offshore Voluntary Disclosure Program. Once again, Rund "clearly ought to have known" that there was a risk of a reporting violation for these accounts, and he very easily could have found out about his obligations. *Horowitz,* 978 F.3d at 89.

### vi.     Rund's personal challenges do not foreclose a finding of willfulness for his reporting violations

While Rund asserts that several personal challenges affected his understanding and awareness of his reporting requirements for his foreign accounts, none of his asserted defenses are enough to protect him from liability. Rund argues that he was i) unsophisticated in business and tax matters, ii) diagnosed with attention deficit hyperactivity disorder ("ADHD") in 2006, iii) under a period of significant stress from 2009 onwards because of his Hong Kong litigation against Charlety, iv) diagnosed with depression and recurrent stage 3 prostate cancer around 2013, and v) finding it difficult to retain an accountant in 2014 and 2015. ECF 39 at 23, 25, 30, 37, 48.

Even accepting each of the difficulties Rund faced as true, the Court cannot agree that they establish that Rund's violations were non-willful. To begin with, a finding of willfulness is based on an objective standard – Rund's personal trials do not factor into this analysis. *Horowitz,* 978 F.3d at 89. Even an individual who was not well versed in business matters, suffered from ADHD and depression, and was under a period of stress could still have been reasonably expected to disclose important financial information to their tax preparers.[8] The standard is whether Rund failed "to act in the face of an unjustifiably high risk of harm that is either known or so obvious

---

[8] *See also* ECF 43 at 10-11 (citing *Sturdy v. Bentsen*, 129 F.3d 122 (8th Cir. 1997) (affirming summary judgment against defendant for willful firearm reporting violation, regardless of alleged attention deficit disorder ("ADD"))).

that it should be known." *Brennan,* 511 U.S. at 836; *see also Bentsen*, 129 F.3d 122. Rund was aware of the FBAR reporting requirements, knew he held at least some financial interests in numerous foreign accounts, and worked with tax preparers whom he easily could have asked for advice. In fact, given the myriad of personal issues Rund was facing and his own purported lack of business skills, it would have been even more appropriate for him to turn to his official tax preparers for advice. *See Gentges*, 531 F. Supp. 3d at 751 ("Defendant, who possesses no financial or tax expertise himself, made no effort to consult his longtime tax preparer to determine whether his belief was correct."); *see also Horowitz,* 978 F.3d at 89 (determining that the defendants' reliance on "faulty advice they had received from others" was objectively reckless).

### vii. Rund's violations cannot be excused by a finding of reasonable cause

Rund also claims that his noncompliance is excused by reasonable cause. *See* 31 U.SC. § 5321 (a)(5)(B)(ii) (barring penalties where a violation was "due to reasonable cause" and "the balance in the account at the time of the transaction was properly reported"). While Rund asserts that he relied on the advice of "trusted advisors," the record does not establish that he discussed his foreign bank accounts with his tax preparers. At most, Rund claims that his 2003 FBAR "tends to show that he discussed his foreign accounts with Daniel Reznick, the CPA who prepared his form 1040," and that although he is a "nearly 74-year-old man diagnosed with ADHD and cognitive impairment, he believes" that he would have provided his tax preparers with information on his foreign bank accounts if requested. ECF 39 at 39-40 (emphasis added). Furthermore, he does not attempt to distinguish which foreign accounts he discussed, and in which years. For these reasons, his reasonable cause defense fails.

The Court finds that Rund willfully violated his FBAR reporting requirements. The Court will next address Rund's claims that he cannot be held liable for his violations, despite this finding of

willfulness, because the penalty was either i) a violation of the Eighth Amendment or ii) assessed after the statute of limitations had run.

**B.   The civil FBAR penalty assessed against Rund does not violate the Eighth Amendment's Excessive Fines Clause**

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 321 (1998) (citation omitted) (cleaned up). At the threshold, the Clause only applies to "fines," which are payments required as "punishment for an offense." *Id.* A fine is excessive—and barred by the Constitution—"if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 334.

**i.   The willful FBAR penalty is not a "fine" within the meaning of the Eighth Amendment's Excessive Fine Prohibition**

To determine whether a civil penalty is a fine, a court must look to whether it "cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either a retributive or deterrent purpose." *See Austin,* 509 U.S. at 620 (quoting *United States v. Halper*, 490 U.S. 435, 448 (1989)).

The Supreme Court's observations in its Excessive Fines Clause cases are helpful in determining the contours of its application. First, the Court in *Austin* held that a civil forfeiture tied to a drug-trafficking crime was not a purely remedial penalty, but was a sanction intended to punish the offender after conviction. 509 U.S. at 620. Looking to the statute's structure and provisions, the Court determined that "[u]nlike traditional forfeiture statutes, §§ 881(a)(4) and (a)(7) expressly provide an "innocent owner" defense." *Id.* at 618. They argued that these defenses demonstrate the statutes' focus on the "culpability of the owner," which makes them "look more like punishment,

not less." *Id.* The Court also examined the legislative history of these forfeitures under 21 U.S.C. § 881(a)(4) and (a)(7). This history led the Court to determine the statutes were enacted in part to address the inadequacy of "traditional criminal sanctions," in "deter[ing] or punish[ing] the enormously profitable trade in dangerous drugs." 509 U.S. at 618 (quoting S. Rep. No. 98-225, p. 191 (1983)). The Court later held in *Bajakajian* that the requirement that persons forfeit unreported currency while leaving the country was designed "to punish the offender." 524 U.S. at 330. The forfeiture was "imposed at the culmination of a criminal proceeding," and the Government conceded that it was imposed in part for deterrence, a punitive purpose. *Id.* at 329 and n.4.

Notably, each of the civil penalties at issue in those cases followed a criminal conviction. The civil FBAR penalty, on the other hand, applies independently of FBAR criminal penalties, and the parallel civil and criminal statutes under 31 U.S.C §§ 5321 and 5322 use different language to refer to their penalties. While the civil provision in Section 5321(a)(5)(A) specifically references the "penalty authorized", the criminal analogue in Section 5322(a) states that offenders will be "fined" for their violations. Indeed, "[t]o read the civil penalty as punitive would render superfluous the separate civil and criminal sanctions regimes Congress specifically enacted." *Landa,* 153 Fed. Cl. at 601. Each of these factors supports the conclusion that the civil FBAR penalty serves a remedial purpose, rather than a punitive one.

The First Circuit in *United States v. Toth*, 33 F.4th 1 (1st Cir. 2022) considered a nearly identical defense under the Excessive Fines Clause and reached the same conclusion.  It first pointed out that the FBAR penalty was "not tied to any criminal sanction," but was assessed "following an administrative tax audit." *Id.* at 15 *Toth* further held that, unlike the forfeiture in *Bajakajian*, this civil penalty was remedial because it was imposed after a fraud on the United States and a loss to the public, not at the conclusion of a criminal proceeding. *Id.* at 16; *see also*

524 U.S. at 330. The history behind the Bank Secrecy Act supports the same conclusion.  The law was enacted to address "hundreds of millions in tax revenues" lost from the use of secret foreign bank accounts. *Id.* (citing H.R. Rep. No. 91-975, at 4397-98 (1970)).

Indeed, "every court" to address the question "has determined that the civil FBAR penalty is *not* a fine under the Eighth Amendment." ECF 38 at 4 (emphasis in the original). Finding the First Circuit and those other courts persuasive, this Court concurs in their finding that the civil FBAR penalty does not constitute a fine for purposes of the Excessive Fines Clause.

### ii. The FBAR penalty applied to Rund is not excessive

But even accepting the argument that the FBAR penalty is a constitutional fine, Rund's Eighth Amendment claim would still fail. That is because the penalty the IRS imposed on him is not excessive.

"[T]he touchstone" of the Excessive Fines Clause is proportionality: "the amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 332. A fine thus violates the Eighth Amendment only if it is "grossly disproportional" to the gravity of the defendant's misconduct. *Id.* Courts must give broad deference to Congress in determining whether a fine is disproportional and look to legislative judgement when addressing whether a punishment for an offense was appropriate. *Id.* at 335. Next, the Court identified several factors used to establish whether a penalty is "grossly disproportional." The Government correctly notes that that these four factors are sometimes articulated in a different manner by different courts; however, this Court will adopt the formulation laid out in the Government's Opposition, which Defendant does not dispute. ECF 38 at 7; *see also Bajakajian*, 524 U.S. at 337-40; *United States v. $134,750 U.S. Currency*, 535 Fed. App'x 232, 239 (4th Cir. 2013). These factors are: "(1) the amount of the penalty authorized by Congress; (2) the class of

persons that the statute at issue principally targets; (3) the harm resulting from the misconduct; and (4) a comparison with potential criminal penalties." *Id.*

Applying these factors, the $2.9 million assessed against Rund is not "grossly disproportional" to the gravity of his offense. First, the amount of penalty authorized by Congress is "the greater of $100,000, or 50 percent" of the "balance in the account at the time of the violation." § 5321(a)(5)(C),(D). Accordingly, when there are multiple violations, the IRS can assess a penalty for any year in which a violation was committed. *See United States v. McBride*, 908 F. Supp. 2d 1186, 1214 (D. Utah 2012) (finding that FBAR penalties assessed against the defendant were proper where one $100,000 penalty was assessed for a reporting violation in 2000 and one $100,000 penalty was assessed for a 2001 violation). Rund's penalty was assessed based on the highest aggregate balance, $5,831,235, which occurred in 2014. ECF 38 at 8. The year 2014 reported the highest balance ($5,831,235), and 50% of that balance resulted in the assessment of approximately $2.9 million in penalties ($2,915,663). ECF 33 at 27. The Bank Secretary Act would have allowed the IRS to assess a penalty that also included 50% of the unreported balances for each year from 2003-2008 and 2013. The IRS made the decision to only assess Rund's penalty for one year, thus falling well below the statutory maximum.

Second, Rund falls under the class of persons that the statute targets. As the Fourth Circuit recognized, the Bank Secrecy Act was passed in 1970 to "combat" the use of foreign bank accounts for tax evasion. *Horowitz*, 978 F.3d at 81. The Act then imposed civil penalties which were specifically meant to address what Congress concluded was the "largest single tax loophole permitted by American law." *Toth*, 33 F.4th at 16 (citing H.R. Rep. No. 91-975, at 4397-98 (1970)). Rund's extensive use of foreign bank accounts, and his failure to abide by his reporting obligations, certainly falls within the conduct the statute was aimed at prohibiting. Rund is a U.S.

citizen, who was aware of certain financial reporting requirements, and still repeatedly failed to disclose his interests in foreign accounts.

Third, Rund's conduct harmed the Government. As discussed above, the reporting violations at issue here do cause a legitimate loss to the Government,[9] Rund's violations over the years have cost a significant loss in tax revenues to the Government, as well as a considerable expenditure for the IRS to investigate and address these violations. ECF 38 at 10-11.

Fourth, the civil FBAR penalties at issue are not out of line with the statute's criminal penalties. Unlike the defendant in *Bajakajian*, who would have only been subject to a criminal fine of $5,000 and yet faced a civil forfeiture of $347,144, Rund would have faced a criminal fine of up to $2 million. *See* ECF 38 at 10 (citing 31 U.S.C. § 5322). [10] The difference here (a factor of about 1.5 between the civil and criminal penalties) is a thus far cry from *Bajakajian* (which involved a factor of about 70). Rund's penalty therefore falls far short of the gross disproportionality that the Constitution prohibits.

Considering each of these factors together, the Court concludes that the civil penalty here – even if considered a "fine" – is not excessive under the *Bajakajian* standard and would not violate the Eight Amendment's Excessive Fines Clause.

### C. Rund's signed consents to extend the FBAR assessment deadline constitute a valid waiver of the applicable statute of limitations

---

[9] There is no genuine dispute of fact that the Government suffered a loss of revenue and resources. Rund argues that the only harm to the Government is the loss of information and that the United States "conceded" this point when it "did not contend that it had sustained any damages" from Rund's violations. ECF 36 at 9-10. However, the record shows that the Government's interrogatory response never contained a statement contending that it did not sustain damages. *See* ECF 36 Ex. A at Resp. to Interrog. no. 17. In fact, the Government responded: "the United States does not make any contentions in this suit regarding … damages … because such 'damages' are irrelevant to the assessment of the FBAR penalty at issue." *Id.* After this, Rund did not move to compel a response.

[10] Rund claims that he would only have been subject to a $250,000 criminal fine, however, this is the applicable fine for a *single* criminal violation. Rund made FBAR omissions for one or more account in 2003-2008, 2013, and 2014. ECF 38 at 10.

The deadline for assessing civil FBAR penalties is six years after the transaction occurs for which the penalty is assessed. 31 U.S.C. § 5321(b)(1). On its face, the date of the IRS penalty (April 30, 2021), would appear to exclude Rund's 2003-2008 and 2013 violations. ECF 38 at 11. Beginning in 2015, however, Rund gave his repeated consent to extend this deadline. *See* ECF 36 Ex. D ("The parties to this agreement desire to extend the time during which the penalties provided by 31 U.S.C. 5321 may be assessed and collected"). Rund's first signed consent applied to the calendar years 2003-2010 and extended the assessment deadline until June 30, 2017. *Id.* Then in 2019, Rund signed another agreement agreeing to extend the deadline for violations from "2003 through 2014" until December 31, 2021. *Id.* Ex. F. Ultimately, the penalty from the IRS was assessed within this deadline, in April 2021.

While it is true that Rund gave consent to extend the assessment deadline in 2019 after the previous deadline had already passed, this consent can still stand. Rund himself acknowledges there is applicable case law upholding waivers of the assessment deadline under 31 U.S.C. § 5321(b)(1). ECF 36 at 12. These cases have held that a taxpayer's consent to extend the assessment deadline in FBAR cases can still be effective if the consent was entered after the deadline passed. *See United States v. Solomon by and through Solomon*, 570 F. Supp. 3d 1195, 1200-02 (S. D. Fla. 2021); *United States v Schwarzbaum,* 2019 WL 13195939 (S.D. Fla. July 31, 2019). Rund nevertheless asks the Court to "reevaluate [the cases'] underlying logic," without providing any legal authority to support his contention that the extension was invalid. *See Schwarzbaum* at *12 ("Generally, a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him") (citing *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1126 n.4 (S.D. Fla. 2019)).

The Court finds that the logic of these cases is persuasive, given that a statute of limitations defense is one which can be waived "unless the deadline is jurisdictional." ECF 38 at 12 (citing Fed. R. Civ. P. 8(c)(1)). Generally, a statute of limitations is not seen as a jurisdictional deadline. *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 546 (4th Cir. 2019) ("Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional…."). Rund has not established that § 5321(b)(1) contains a clear textual indication that it is jurisdictional; and the Court finds no reason to conclude that it is. Rund twice decided to consent to an extension, and accordingly, he benefitted from additional negotiation time and a delay in collection. ECF 38 at 13. He may not now dispute these consents to halt the Government's collection of its penalties.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff's Motion for Summary Judgment (ECF 32) is **GRANTED**; and it is further

**ORDERED** that Defendant's Motion for Summary Judgment (ECF 35) is **DENIED**; and it is further

**ORDERED** that **JUDGMENT** is entered in favor of the United States of America against Richard M. Rund in the amount of $2,915,663 as of April 30, 2021, consisting of an assessment against him under 31 U.S.C. § 5321(a)(5), plus pre- and post-judgment interest and penalties accruing on that assessment in accordance with 31 U.S.C. § 3717.

The Clerk is directed to enter judgment in favor of the United States of America pursuant to Fed. R. Civ. P. 58 and to close this civil action.

**IT IS SO ORDERED.**

/s/ Michael S. Nachmanoff

August 6, 2024                              Michael S. Nachmanoff
Alexandria, Virginia                       United States District Judge